David Sanford* (D.C. Bar No. 457933)
Kate Mueting* (D.C. Bar No. 988177)
**SANFORD HEISLER, LLP**
1666 Connecticut Avenue, N.W., Suite 300
Washington, D.C. 20009
Telephone: (202) 499-5201
Facsimile:  (202) 499-5119
dsanford@sanfordheisler.com
kmueting@sanfordheisler.com

Deborah Marcuse* (NY Bar No. 457933)
Jennifer Siegel (NJ-6110)
**SANFORD HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5656
Facsimile: (646) 402-5650
dmarcuse@sanfordheisler.com
jsiegel@sanfordheisler.com

*Counsel for Plaintiffs*


*admitted *pro hac vice*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **KELLI SMITH, KANDICE BROSS, RACHEL MOUNTIS, AMY SHURSKY and KATE WHITMER, individually and on behalf of a class of similarly situated female employees,**<br><br>**Plaintiffs,**<br><br>**-- against --**<br><br>**MERCK & CO., INC,**<br><br><br>**Defendant.** | **No. 3:13-cv-02970(JAP/LHG)**<br><br><br><br>**JURY TRIAL DEMANDED** |

Defendant Merck & Co., Inc, discriminates against its female employees generally, and its pregnant employees and female employees with children in particular, through: (a) discriminatory policies, practices and procedures in promotion and advancement; (b) disparate pay; (c) differential treatment; (d) hostile work environment; and (e) retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 and the Lilly Ledbetter Fair Pay Act of 2009 ("Fair Pay Act"), Title 42 U.S.C. 2000e, *et. seq.* ("Title VII"); the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*; the New Jersey Family Leave Act, N.J. Stat. Ann. § 34:11B-1, *et. seq*; and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1, *et seq*.

Plaintiffs sue for declaratory and injunctive relief, back pay, front pay, compensatory, nominal and punitive damages and attorneys' fees, costs and expenses under Title VII, the EPA, the FMLA, the New Jersey Family Leave Act and the New Jersey Law Against Discrimination.

1

Plaintiffs request a jury trial on each of these counts.  Plaintiffs allege upon knowledge as to themselves and otherwise upon information and belief as follows:

I.      **<u>INTRODUCTION</u>**

1.      Defendant Merck & Co., Inc. is a global pharmaceutical powerhouse that manufactures and sells prescription medicines, vaccines, biologic therapies, animal health products, and consumer care products.   Merck employs roughly 83,000 employees worldwide. Approximately 5,200 of those employees work for the company's United States sales operation. Merck publicly touts itself as valuing diversity and providing equal employment and leadership opportunities for women.  This could not be further from the truth for Merck female sales representatives across the nation, especially those who are or have been pregnant or are caregivers to young children.  The reality is that the company reaps astronomical profits by systemically discriminating against its predominately female sales force that it relies on to sell its drugs.

2.      Merck's glass ceiling and maternal walls are indisputable.  According to Merck's corporate website, in 2012, only 31% of executive roles in Merck's U.S. operations were held by women.  The gender disparities become even starker when isolating the company's sales unit, where men dominate all tiers of management from the manager-level to the director-level and above.  This is shocking considering the fact that approximately 56% of the company's rank-and-file sales representatives are women.

3.      The predominately male sales leadership team, consisting of Directors of Commercial Operations and above, maintains control over nearly all aspects of  sales representatives' employment, including compensation, promotions, performance evaluations, and terminations.

2

4.      Merck has systemically paid female sales employees less than similarly situated male sales employees who performed the same job duties and worked under the same conditions. Merck has also denied female sales employees access to leadership positions across the company, among other discriminatory acts.  Female sales employees who are or have been pregnant, take maternity leave, are caregivers, or who avail themselves of the company's job share program are particularly vulnerable at Merck.

5.      The company fosters a "boys' club" environment in which women are excluded from the company's "tap-on-the-shoulder" promotions and promotional opportunities.  Female sales representatives are often prevented from being considered for promotions by Merck's practice of filling open positions before posting the openings and of requiring manager approval to apply for promotions.  Women—regardless of their qualifications—are not accorded the same advancement opportunities as men.

6.      Members of Merck's predominately male senior leadership are able to demean and degrade female sales representatives with impunity.  Male leaders have referred to women as "whores" and regularly sexually harass them.  One senior leader in particular harassed a female sales representative at a company event, telling her that she was the "hottest one" in the room and asking what he could do to get her to go to his hotel room to have intercourse.

7.      Senior leaders at Merck make personnel decisions based on unlawful stereotypes that men are "breadwinners" responsible for financially supporting their families, while women should "stay at home" with children.  Female sales employees who are or have been pregnant or who take maternity leave are particularly vulnerable and are regularly managed out of the company.  Female sales employees are actively discouraged from having children.  Merck's senior leadership team frequently tells women who are or have been pregnant outright that they are unable to advance because of their pregnancies or because they took maternity leave.

3

**A.  Merck Pays Female Employees Less Than Male Employees For the Same Work.**

8.      Merck has systematically paid female sales representatives less than similarly situated male employees in all forms of compensation, including base pay, salary increases, and incentive compensation.  Merck's compensation policies and practices are uniform throughout the company.

9.      Merck underwent a company-wide reorganization in 2010. As early as March 2011, compensation has been based on the company policy and practice of assigning sales representatives to newly developed tiers.  Under this scheme, Merck senior management assigns sales representatives to one of three tiers:  S1 is the lowest tier, S2 is the middle tier, and S3 is the highest tier.  Employees in S1 are paid within a salary range that is lower than the salary range that applies to employees in S2, while S3 employees are paid within the highest salary range. Merck senior management does not publish the criteria it uses to assign employees to tiers; however, the inconsistency between tier assignments and objective sales performance indicates that tier assignments are not based solely on sales numbers.  Upon information and belief, Merck senior management systematically assigns female sales representatives, including those who were, are or had been pregnant, to lower tiers than male sales representatives with the same job duties and qualifications, irrespective of whether the overall sales numbers and performance of the sales representatives warrants such low tier assignments.

10.     Upon information and belief, Merck senior management makes compensation and evaluation decisions during "differentiation meetings" in which sales employees are ranked on a forced curve.  Merck fails to disclose either the "ranks" to which sales representatives are assigned or the company's own method for ranking employees on the forced scale, ensuring thereby that the policy lacks sufficient standards, transparency, and oversight.  The direct

4

supervisors of sales representatives, Customer Team Leaders, or "Managers," do not have the authority to make tangible employment decisions.  These nominally supervisory individuals have often informed female sales representatives that they are simply reading from pre-approved "scripts" from senior management when they communicate employment-related decisions.

11.    Upon information and belief, Merck senior management also assigns representatives a "competency score." The company purports to base this score not on a representative's objective sales numbers, but instead on undefined or vaguely defined characteristics such as "business acumen," "account management," "one-on-one consumer interactions," and "business contribution."

12.    Upon information and belief, the compensation of female employees who are or have been pregnant or taken leave is further suppressed through these discriminatory evaluation, tiering, ranking, and award policies and practices.  Female sales representatives and sales representatives who are or have been pregnant receive lower evaluations, tiers, and rankings and fewer awards than male employees, even if their overall performance meets or exceeds that of similarly situated male employees.  Merck routinely tells female sales representatives that it gave them negative reviews because they were pregnant or had taken leave.

13.    Merck also fails to disclose its method for selecting award recipients, leaving women who are denied awards without the information that would allow them to assess or challenge the fairness of the company's decisions.

**B. Merck Promotion Policies and Practices Prevent Female and Pregnant Employees from Advancing.**

14.    Merck senior management also develops and implements policies and practices of promoting employees based on a "tap on the shoulder" before the company posts the job openings.  Employees are also not permitted to apply for open positions absent approval.

Through both of these policies and practices, Merck prevents female employees and employees who are or have been pregnant from advancing.

15.     Additionally, Merck fails to provide its female employees and employees who are or have been pregnant with the leadership positions they deserve.

## C. Merck Fails to Remedy Discrimination and Retaliates Against Women Who Complain.

16.     Women who suffer the effects of Merck's discrimination are discouraged from raising complaints and are retaliated against when they do.  Despite receiving numerous complaints from several women, Merck has taken no steps to remedy its discriminatory policies and practices.  Instead, the company further damages the victims of its discrimination by subjecting them to retaliation for their protected activity.

17.     For example, Ms. Smith repeatedly complained about discrimination, reporting misconduct through the requisite channels, including her manager, director, Human Resources, and the Ombudsman's office. None of these individuals or offices took any action to investigate adequately or to rectify the discrimination reported by Ms. Smith.  Instead, Merck management and Human Resources discouraged Ms. Smith from making further complaints, telling her to "move on" because they were not involved "in a lawsuit."  After Ms. Smith filed this lawsuit alleging discrimination, it was made clear to her that she had zero prospect of upward advancement at Merck.

18.     Other female employees who complain are told by their directors that they are "whining" and directed to "lie" to Human Resources by telling them that the director was unaware of the discrimination they are experiencing at the company.

19.     While Merck has a company-wide Human Resources hotline that employees can use to report discrimination, Merck does not return calls made to the hotline or otherwise follow up on or investigate complaints.

20.     On its website, Merck purports to address this dearth of female management through its "Women's Leadership Development Program," ostensibly designed to foster women's leadership development. While Merck boasts of the hundreds of women who benefit from this program, women at Merck are generally unaware of the program, and Merck rarely, if ever, addresses issues of gender or discrimination during company meetings and events.

21.     When female employees seek to have the company address and remedy Merck's culture of discrimination, Merck executives obstruct their efforts. For example, Merck's male management refused to support the establishment of a women's network chapter in New Jersey, emphasizing that management was not "comfortable" with the proposal and forbidding women from discussing any programs for advancing women.

## II.    JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332(a)(1), 29 U.S.C. § 206, *et seq*. and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because unlawful employment practices occurred in New Jersey, where Merck is headquartered and where some of the Plaintiffs have worked.

24.     A substantial part of the events or omissions giving rise to the claims set forth herein, including the discriminatory denial of pay and promotions, occurred in New Jersey.

25.     Plaintiffs have standing to bring this suit as Ms. Smith timely filed her administrative charge before the Equal Employment Opportunity Commission ("EEOC") in

October 2011, received her Right to Sue on April 2, 2012, and entered into a tolling agreement with the Defendant to toll her Title VII and EPA claims on June 25, 2012.  Ms. Smith's timely filed administrative charge gave notice of the class-wide nature of her allegations.  The parties' tolling agreement provided that Ms. Smith's claims would be tolled until either party gave notice terminating the tolling agreement.  Ms. Smith's counsel notified Merck on May 9, 2013 that she was terminating the agreement.  Ms. Smith filed a Complaint in this action on May 9, 2013.

### III.    **PARTIES**

26.    From June 2004 to December 2013, PLAINTIFF KELLI SMITH was a female "employee" at Merck, as defined by Title VII, the EPA, and corresponding state law.  From June 2004 to December 2013, Ms. Smith worked in Toms River, New Jersey.  From June 2004 to the present, Ms. Smith has lived in Lanoka Harbor, New Jersey.

27.    From January 2010 to the present, PLAINTIFF KANDICE BROSS has been a female "employee" at Merck, as defined by Title VII, the EPA, and corresponding state law.  Ms. Bross worked for Schering-Plough in Center City, Pennsylvania from October 2007 until its merger with Merck in January 2010.  She worked for Merck in Mount Laurel, New Jersey from January 2010 to December 2012 and in Wilmington, Delaware from January 2013 to the present.  From October 2007 to the present, Ms. Bross has lived in Swarthmore, Pennsylvania.

28.    From March 2005 through December 2013, PLAINTIFF RACHEL MOUNTIS was a female "employee" at Merck, as defined by Title VII and the EPA.  Ms. Mountis worked in New York, New York from March 2005 to April 2010 and in Los Angeles, California from June 2010 through December 2013.  From April 2010 to January 2014 Ms. Mountis lived in Los Angeles, California.  From January 2014 to the present, Ms. Mountis has lived in Charleston, South Carolina.

8

29.     From September 2000 to the present, PLAINTIFF AMY SHURSKY has been a female "employee" at Merck, as defined by Title VII.  She worked at the company's headquarters in Whitehouse Station, New Jersey from September 2000 to March 2004, in New York, New York from March 2004 to March 2009, in Jersey City, New Jersey from March 2009 to December 2010 and in Scranton, Pennsylvania from January 2011 to the present.  Ms. Shursky has lived in Factoryville, Pennsylvania since January 2010.

30.     From July 2005 to January 2012, PLAINTIFF KATE WHITMER was a female "employee" at Merck, as defined by Title VII and the EPA.  Ms. Whitmer worked in Thousand Oaks, California from July 2005 to November 2005 and in Pasadena, California from November 2005 to January 2012.

31.     At all times relevant to this action, DEFENDANT MERCK & CO, INC. is and has been a multi-national company headquartered in Whitehouse Station, New Jersey.

## IV.    FACTUAL ALLEGATIONS

### A.    KELLI SMITH'S FACTUAL ALLEGATIONS

#### 1.    Ms. Smith Joined Merck in 2004 and Earned Accolades for Her Performance.

32.     Ms. Smith was employed at Merck as a "Senior Sales Representative" from June 2004 through December 2013.

33.     When Ms. Smith joined Merck in June 2004, she had six years of sales experience and had regularly received national recognition for her strong performance and top sales rankings.

34.     Ms. Smith consistently achieved exceptional results and distinguished herself as a top performer.  She earned the Vice President's Club Award in 2005 and the Director's Club

Award in 2006, 2007, and 2008.  She also earned the Customer Trust and Value Award in 2009, a distinction that Merck awarded to only one representative out of approximately one hundred.

35.     Ms. Smith led multiple projects at Merck, and her colleagues also recognized her as a resource for the team, praising her diligence and leadership.  For example, one of her colleagues congratulated her on her leadership and extensive work in preparing a set of resources for new employees who joined the company as a result of its 2010 merger with Schering-Plough.

36.     Ms. Smith's sales numbers have always placed her among the top performers of her region.  Ms. Smith's district was consistently among Merck's highest-performing districts, and even within this district, her individual performance stood out.  In 2011, Ms. Smith consistently ranked second out of forty-four sales representatives in the Northeast Region based on her sales numbers.

> **2.     Merck Paid Ms. Smith Less Than Similarly Situated Male Employees For the Same Work and Afforded Her Fewer Promotional Opportunities.**

37.     Despite her skills and qualifications, Merck discriminated against Ms. Smith because of her gender and because she was and had been pregnant and taken leave.  For example, Merck denied Ms. Smith promotions and promotional opportunities, disciplined her unfairly and without justification, gave her unfair performance evaluations and subjected her to other discriminatory actions that have stalled her career and harmed her professional reputation.

38.     Upon information and belief, Merck paid Ms. Smith less than male employees with the same job duties and performed under the same working conditions, including a male sales representative who started at Merck the same time Ms. Smith did and whose performance was no better than Ms. Smith's.

39.     Merck also demoted Ms. Smith during the company-wide reorganization in March 2011, after she returned from maternity leave.  Before Ms. Smith took maternity leave,

10

she ranked in the third-highest of six ranking categories.  However, after she returned from leave, Merck implemented the three-tier system and placed Ms. Smith in the lowest tier, S1.

40.     Despite Ms. Smith's seven years of high performance at the company, Merck's tier assignment placed her in the same tier as entry-level representatives, decreasing her bonus compensation and denying her opportunities for prestigious assignments and higher compensation.  Merck publicized its tiers company-wide, thereby signaling to all Merck employees that Ms. Smith was an entry-level employee and unqualified for leadership roles. Despite her exceptional performance and many requests for promotion, Ms. Smith remained at the S1 level until her constructive discharge in December 2013.  Meanwhile, Merck advanced a male sales representative who was neither more experienced nor more qualified in other respects than Ms. Smith to the S2 level and paid him considerably more than Ms. Smith.

41.     Merck also denied Ms. Smith the prestigious Vice President's Club Award in March 2011, awarding it to male employees with lower sales numbers than Ms. Smith who also lacked her skill, experience, and leadership.  Merck denied this award to only three members of Ms. Smith's team: Ms. Smith, another female employee with children, and a male employee who had just started working at Merck.

42.     Merck told Ms. Smith that the company's decision to assign her to its lowest tier and to deny her the Vice President's Club Award were not made because Ms. Smith had under-performed but because she had been pregnant and had taken leave.  Director of Commercial Operations John Daly ("Director Daly"), who fostered close friendships with the male employees on his team to the exclusion of female employees, told Ms. Smith that her tier assignment was due to "the timing of [her] baby," while Customer Team Leader Ed Veltre ("Manager Veltre") confirmed that Ms. Smith's failure to win the Vice President's Club Award the year she took maternity leave was "a matter of timing."

11

43.     After Ms. Smith complained that the company's evaluation of her had nothing to do with her performance and that instead the company had assigned her to the lowest tier exclusively because of her pregnancy, Manager Veltre responded only: "I know I'll be eating crow on this one," while Director Daly stated: "It's not like this is a lawsuit."

44.     When Ms. Smith suggested to Director Daly that she would pursue the matter further with Merck's Human Resources Department, her male manager immediately tried to discourage Ms. Smith from exercising her right to pursue her claims and told her to "move on."

45.     Realizing that her low tier assignment was the result of Merck's discrimination and that Merck was not making any effort to rectify the situation, Ms. Smith complained on several occasions, including in March 2011, April 2011, and July 2011, to the Ombudsman's office and to Merck's Office of Ethics and Human Resources, none of which took any action to rectify the discrimination.

46.     In fact, when Ms. Smith raised the discrimination to which Merck had subjected her to HR Representative Levi Barnes from the Office of Ethics, he further confirmed that Merck's decision to demote Ms. Smith was the result of her having been pregnant and taken maternity leave.

47.     Ms. Smith later complained of discrimination to HR Representative Susan Leahy. However, Ms. Smith received an automated email only three days later from the Office of Ethics informing her only that it had "investigated" and closed her case without identifying any steps to rectify the situation.  Upon information and belief, Ms. Leahy is in social clubs with Merck senior management.  Ms. Smith raised concerns to another HR Representative that Ms. Leahy could not investigate her complaint of discrimination fairly in light of her personal relationships with members of Merck senior management, but HR rejected Ms. Smith's concerns.

48.     Frustrated with HR's inaction, on April 11, 2011, Ms. Smith again complained to Ms. Leahy of discrimination and retaliation and attempted to re-open her case.  Ms. Leahy, however, again failed to address Merck's discrimination, and instead blamed Ms. Smith, telling her she could remedy her demotion by improving her skills in Payer Plan and Managed Care, the same category that Manager Veltre had earlier rejected as an area for improvement.

49.     After being ignored by HR Representatives and everyone else she spoke with at Merck, Ms. Smith again complained to Director Daly that her tier assignment was the result of discrimination by company management.

50.     Director Daly told Ms. Smith that complaining of discrimination was "inappropriate" and that she "crossed a line" in doing so.  He also accused her of "undermining" Manager Veltre and stated he would be scrutinizing her more closely by accompanying her on field trips and scheduling frequent meetings with her.  He again insisted that Ms. Smith "move on" and drop the issue of her tier.

51.     In June 2011, shortly after Ms. Smith complained to Human Resources, Merck disciplined Ms. Smith for allegedly violating company policy more than two months earlier. However, upon information and belief, Merck did not discipline male employees who routinely violated company policies.   The discipline adversely affected Ms. Smith's standing, compensation, and advancement opportunities.

52.     Through its policy and practice of filing positions before they are posted, Merck further attempted to push Ms. Smith out of the company and threatened her ability to advance. In early June 2011, only a couple of weeks after Ms. Smith complained of discrimination with Mr. Barnes, Merck failed to inform Ms. Smith of four opportunities for promotions, even though Ms. Smith had previously expressed strong interest regarding these positions.  Ms. Smith was

ultimately unable to apply for these positions because of Merck's policy and practice of filling open positions before posting the positions.

53.     Moreover, Merck stalled Ms. Smith's career by refusing to issue performance reviews that accurately reflected her strong performance, making Ms. Smith anxious and concerned about her future at the company.

### 3.     Merck Subjected Ms. Smith to a Hostile Work Environment.

54.     Merck senior leadership fosters an environment in which female employees and employees who are or have been pregnant are harassed and marginalized.  Manager Veltre and Director Daly often invited male employees to bars and restaurants, encouraging a "boys' club" atmosphere that excluded female sales representatives.   This boys' club was created and perpetuated by members of Merck's male senior leadership team, who would often make inappropriate advances to female employees.  For example, at a national conference, Director Daly drunkenly and inappropriately propositioned a female employee in front of several other employees, stating that the employee was "the fucking hottest one in here" and asking her "what it would take" for her to accompany him "upstairs" to his hotel room.

55.     Additionally, Director Daly failed to take any action when Ms. Smith complained to him in August 2011 that Manager Veltre regularly demeaned her and made her feel uncomfortable by kissing her in front of others at team meetings.

56.     Male senior management at Merck demeans and degrades female employees with impunity, further reinforcing an atmosphere in which the professional contributions of female sales employees go unrecognized.  For example, at a company event, Director Daly loudly asked a group of male employees, "Where are the Schering whores?" referring to the female employees from Schering-Plough, who had joined Merck in the 2010 merger. "They're much hotter than the Merck whores," he added.

57.     As a result of Merck's discrimination and retaliation, Ms. Smith's physical and mental health has been severely affected, causing her to seek professional therapy and prescription anti-anxiety medication.

58.     Ms. Smith's opportunities for advancement, already diminished due to Merck's discriminatory policies and practices, were further hampered after she filed this lawsuit against Merck in May 2013.  In response to her filing, Merck marginalized and stigmatized Ms. Smith. Among Ms. Smith's peers and superiors it was common knowledge that because she had spoken out against the company's discrimination, Merck senior management would not allow her to advance in her career.  When she brought this up to a male superior at Merck, he agreed, stating, "you're not going anywhere."  Ultimately, due to the intolerable conditions at Merck, Ms. Smith had choice but to leave the company in December 2013.

B.     KANDICE BROSS' FACTUAL ALLEGATIONS

1.     Ms. Bross Has Earned Accolades for Her Performance.

59.     Ms. Bross began working at Merck in January 2010 when Merck merged with Schering-Plough.  At that time, Ms. Bross had five years of sales experience.  She graduated in January 2006 from Wilkes University with a Bachelor of Science in Business Administration and from the University of North Alabama in May 2009 with a Master's Degree in Business Administration.  Before joining Schering-Plough in October 2007, Ms. Bross worked as a sales representative for two years, consistently surpassing her sales quotas.

60.     In April 2009, Schering-Plough gave Ms. Bross two awards based on her sales performance.  Later that year, Ms. Bross ranked among the top twenty-five representatives nationwide for growth in market share for one of her products.

61.     Ms. Bross was also a representative on Schering-Plough's National Leadership Council in 2009.  In that role, she was responsible for addressing complaints of field

representatives and presenting their concerns to regional management.  Ms. Bross' manager noted that she was a "leader among [her] peers" and that her "thirst for learning" and desire to be the best "sets [her] apart from the competition."  Another manager in Ms. Bross' region gave her a personal "Above and Beyond" appreciation award for her leadership at Schering-Plough.

> **2.    Merck Paid Ms. Bross Less Than Similarly Situated Male Employees for the Same Work and Afforded Her Fewer Promotions and Promotional Opportunities.**

62.    Despite Ms. Bross's skills and qualifications, Merck discriminated against her because of her gender and because she had been pregnant.  Merck paid Ms. Bross significantly less than her male counterparts, denied her promotions, promotional opportunities and awards, and subjected her to unfair territory reassignments and a hostile work environment.

63.    Upon information and belief, Merck assigned Ms. Bross during her initial hire to a lower level position, lower compensation band, and/or lower tier than equally qualified male employees with the same job duties.  In September 2010, Ms. Bross' Customer Team Leader Michael Flaherty ("Manager Flaherty") admitted to Ms. Bross that her salary "stuck out like a sore thumb" relative to the salaries of others in her region; accordingly, Merck slightly increased her salary.

64.    Even after this pay raise, however, Merck still paid Ms. Bross significantly less than her male counterparts who performed the same job duties under the same working conditions.  In August 2012, Manager Flaherty showed Ms. Bross a bell curve of the salaries of all sales employees in Ms. Bross's region.  After two salary increases, Ms. Bross' salary was still significantly lower than the rest of the team, including male counterparts such as Steve Urbansky and Charles Clontz, both of whom performed the same job duties under the same working conditions.

65.     Ms. Bross asked Manager Flaherty why she was paid less than her male counterparts for the same work; Manager Flaherty could offer no explanation.  Upon information and belief, Merck continues to underpay Ms. Bross by thousands of dollars per year in comparison to the compensation her male colleagues collect for performing the same job duties under the same working conditions.

66.     Upon information and belief, Merck pays male sales representatives, such as Sean Theis, Charles Clontz, and Jay Gilbert, more and accords them greater advancement opportunities because they are "breadwinners" who "provide[] for their families," despite the fact that they perform the same job duties under the same working conditions as Ms. Bross.

67.     Upon information and belief, Ms. Bross' disproportionately low compensation is based in part on her competency score.   In 2010, despite her successful objective sales performance, Merck gave Ms. Bross a negative performance review and the lowest competency score, even though her sales numbers had been among the highest in her district.  When Ms. Bross asked Manager Flaherty why Merck had given her such a low competency score at the end of such an objectively successful sales year, he referenced Merck's company-wide policy and practice of ranking employees on a forced curve and stated that, "somebody had to be at the bottom."

68.     Merck also discriminated against Ms. Bross by denying her equal promotional opportunities afforded to equally or less qualified male sales representatives. During the company's March 2011 reorganization, Merck assigned Ms. Bross to the lowest job tier of S1. At the same time, Merck assigned male employees who had lower sales numbers than Ms. Bross, such as Mr. Theis and Mr. Urbansky, to the better-compensated S2 tier.  When Ms. Bross asked Manager Flaherty why Merck did not assign her to the S2 tier, Manager Flaherty did not even

attempt to tie the tier assignment to Ms. Bross's performance, instead stating only that she should be "thankful" and that she was "lucky to have a job."

69.     Merck also denied Ms. Bross an elevation to the S2 tier in 2012, the year she took maternity leave, instead promoting a male employee who was equally or less qualified.

70.     Upon information and belief, Merck's policies and procedures prevented Ms. Bross from being elevated to the S2 tier the year she took maternity leave, the same year Manager Flaherty described Ms. Bross's taking of protected maternity leave as "unfortunate."

71.     Merck also gave Ms. Bross a lower review than her performance justified explaining in her review that it had been a "VERY busy year for [her] and [her] family."  Merck informed Ms. Bross that she did not qualify for an award that the entire team had earned because she had been pregnant and taken maternity leave, even though the award was purportedly based on sales performance for a period of time before Ms. Bross had taken leave.

72.     Merck also denied Ms. Bross the Vice President's Club Award for 2010, even though her sales numbers were the same as those of her territory partner Charles Clontz, who received both the award and a higher bonus than Ms. Bross that year.

73.     Through its tap-on-the-shoulder promotion policies and practices, Merck denied Ms. Bross other promotional opportunities.  For example, in 2011, Ms. Bross asked Merck if she could be the lead representative on a respiratory product, a role that would have increased Ms. Bross's visibility and reinforced her status as a leader within the company.  Although Ms. Bross had been in this position on similar projects at Schering-Plough and she had exhibited strong performance with this product, Merck instead gave the opportunity to Mr. Theis.

74.     Ms. Bross asked Merck numerous times in 2011 and 2012 for more responsibility and a leadership role on the team.  Ms. Bross was well-suited for leadership positions such as Merck's "Change Agent" or "Voice of the Employee" positions due to her experience in a

18

similar role as National Leadership Council Representative at Schering-Plough.  Instead, Merck gave both of these opportunities to Mr. Clontz.

75.     Merck also discriminates against Ms. Bross through territory reassignments. Upon her return from maternity leave in December 2012, Merck told Ms. Bross that she would be transferred to a new region in Wilmington, Delaware.  Merck did not explain its transfer decision, and Merck did not transfer the male employees in Ms. Bross' region.  This transfer has required Ms. Bross to build new relationships with new doctors, has adversely affected her sales numbers, and will affect her competency score, which is based, in part, on a sales representative's knowledge of her territory.  Upon information and belief, the effect of this transfer on Ms. Bross' competency score and sales numbers will decrease her compensation even further.

### 3.      Merck Subjected Ms. Bross to a Hostile Work Environment and Retaliated Against Her When She Complained.

76.     Upon information and belief, Merck's discriminatory decisions were based on Merck's boys' club culture and culture of encouraging women to leave the workforce after they have children.

77.     This boys' club culture is encouraged and fostered by senior leadership at company-wide meetings.  Merck management and Director of Commercial Operations Todd Andrade ("Director Andrade") foster an environment in which male supervisors frequently socialize with male employees during work and after hours, but make no attempt to socialize with female employees.  At one meeting in Chicago in 2011, Ms. Bross approached Director Andrade, but he was dismissive of her and her request that he accompany her on a ride-along to observe her performance.  Upon information and belief, Director Andrade routinely conducts

ride-alongs with male sales representatives, providing them with greater exposure to management and professional development opportunities.

78.    At a social event during that same meeting—attended by members of Merck senior management including the Vice President of the Northeast Commercial Operations Group, Art Hirt—Manager Flaherty's behavior made Ms. Bross and other women uncomfortable, and when they attempted to leave the social event, Manager Flaherty responded by saying that the "girls" were "no fun," without any intervention from Merck senior management.   Manager Flaherty also pressured female employees to get drunk with male employees on company trips in 2010 and 2012, and he frequently teases Ms. Bross, calling her "too uptight" and "like a little old lady" because she does not "laugh at [his] jokes."

79.    At a coworker's baby shower Ms. Bross attended while she was on maternity leave, Manager Flaherty asked a group of Merck employees if they had "seen Kandice's breasts."   Another male employee, Jason Gilbert, told Ms. Bross' colleagues that "these girls" did not deserve having their jobs instead of male employees who "provided for their families" but had lost their jobs in the merger with Schering-Plough.   Merck management was aware of Mr. Gilbert's comment and, upon information and belief, did not discipline Mr. Gilbert or take any action.   On another occasion, Mr. Gilbert again referred to Ms. Bross and her co-worker as "these girls" that walked in to the team "thinking they are hot."

80.    In 2012, Manager Flaherty told Ms. Bross that she should not return from her maternity leave but instead "stay at home" because her "husband makes enough money."

81.    As a result of Merck's discrimination and continuing retaliation, Ms. Bross has suffered and continues to suffer from high levels of stress and anxiety.

C.   RACHEL MOUNTIS' FACTUAL ALLEGATIONS

1.   **Ms. Mountis Has Earned Accolades for Her Performance.**

82.   Ms. Mountis began working at Merck in March 2005 as a Medical Representative.   She graduated from Penn State University with a Bachelor of Science in Finance in 2003 and earned a Master of Business Administration from New York University in 2010.   Before joining Merck, Ms. Mountis worked from 2003 through 2004 as an Account Manager for a distribution and order fulfillment company where she was consistently ranked in the top 10% of her team and won the Rookie of the Year Award in 2004.

83.   Merck promoted Ms. Mountis from a Medical Representative to a Medical Vaccine Specialist within one year.   The company again promoted her in 2008 to a Vaccine Specialist and transferred her to an Adult Vaccine Specialist position in 2010.

84.   Furthermore, in the spring of 2009, Ms. Mountis had multiple discussions with Director of Commercial Operations TJ Harvey ("Director Harvey") about her future at the company. During these discussions, Director Harvey assured Ms. Mountis that she would have the support of Merck senior management for a promotion to a position at the company's headquarters.

2.   **Merck Paid Ms. Mountis Less Than Similarly Situated Male Employees, Accorded Her Fewer Promotional Opportunities, Laid Her Off, and Demoted Her.**

85.   Despite Ms. Mountis's skills and qualifications, Merck discriminated against her because of her gender and because she was and had been pregnant.   Upon information and belief, Merck paid Ms. Mountis less than similarly situated male employees, including a male sales representative Mike Gallicchio, even though their job duties and working conditions were the same, and their performance, sales numbers, and experience were comparable.   Merck also laid Ms. Mountis off during a reorganization, demoted her, gave her unfair performance evaluations,

denied her promotions and promotional opportunities, and subjected her to other discriminatory actions that have stalled her career and harmed her professional reputation.

86.     In the fall of 2010, Merck announced it would be merging two sales teams and laying off certain representatives in the existing teams as a result.  Merck stated that it would determine layoffs based on three factors: 1) the employee's sales numbers from the previous two years; 2) an evaluation of the employee's competencies; and 3) the location of the employee's residence relative to Merck's sales territories.

87.     In late November 2010, four weeks before she was due to deliver, Ms. Mountis went on a Short-Term Disability leave due to serious pregnancy-related health problems.  Just one week later, on December 3, 2010, Ms. Mountis' Customer Team Leader Erle Wynn contacted Ms. Mountis to inform her that Merck had decided to lay her off.  He told her, "I'm reading from a script," indicating that the company's decision to lay Ms. Mountis off was entirely out of his hands.  Ms. Mountis contacted her former Customer Team Leader John Connelly, who expressed his shock at this decision, further suggesting the decision was made by Merck senior leadership.

88.     Soon after Ms. Mountis learned she had been laid off, Director of Commercial Operations Chris Bianco called Ms. Mountis to apologize.

89.     Ms. Mountis later learned that Merck assigned Mr. Gallicchio to the territory from which she had been laid off, even though their sales numbers were comparable and he had not won the awards, including the Vice President's Club Award in 2010, that Ms. Mountis had won.

90.     Per Merck policy, following her layoff, Ms. Mountis had two months to apply through internal job listings to open positions at Merck.  Because Ms. Mountis would be on maternity leave during this two-month window, she asked Merck's HR department for an extension.  HR denied her request, suggesting that she search and apply for jobs from the

hospital.  Ms. Mountis applied for positions on the day she checked into the hospital and interviewed in person just ten days after her Caesarean section surgery.  Merck eventually hired her to a position with a lower bonus potential and fewer leadership opportunities—that of Senior Customer Representative for the Disease Focus Respiratory division.

91.     In April 2011, Merck informed her that, as part of the company's reorganization of employees into the "S" tiering system, Merck had assigned Ms. Mountis to the lowest tier, S1. Ms. Mountis' Customer Team Leader Andy Darling ("Manager Darling") admitted to Ms. Mountis that she was overqualified for this position but indicated that his hands were tied and the decision was not within his control.

92.     Merck again demoted Ms. Mountis in December 2012 while she was on her second maternity leave.  Upon information and belief, Manager Darling was also reading from a pre-approved script when he called Ms. Mountis with the news that Merck had reassigned her to a less-prestigious position in a territory significantly farther from her home.  Ms. Mountis objected to this, and Manager Darling indicated that Merck senior management told him it would not be possible to make any additional reassignments but that he would check with them again. Upon information and belief, Merck reassigned another female employee on maternity leave to a territory significantly farther from her home.

93.     After demonstrating her exceptional skill and professional commitment over nearly nine years of service to Merck, Ms. Mountis was frustrated to find that, rather than reward her performance, Merck had stifled her career and interfered with her professional development.

94.     As a result of Merck's discrimination, Ms. Mountis suffered and continues to suffer from high levels of stress and anxiety.

### D.   AMY SHURSKY'S FACTUAL ALLEGATIONS

#### 1.   Ms. Shursky Exhibited Strong Performance.

95.     Ms. Shursky began working for Merck as an Analyst in September 2000 after graduating from Syracuse University's School of Management with a dual major in Marketing and Management Information Systems in May of that year.   She became a Specialty Representative in New York in March 2004.   While in this position, Ms. Shursky won the prestigious Director's Award three years in a row, from 2006 to 2008 and served in several leadership positions, including acting as the only "Class Counselor" in her region for a training session in 2006.  Ms. Shursky became a Senior Hospital Representative in November 2007 and a Senior Disease Focus Representative in March 2009.  Ms. Shursky regularly served as a leader for her peers, acting as a Peer Mentor on several occasions between 2006 and 2010.  Merck also selected Ms. Shursky to serve as "Voice of the Employee," a prestigious position in which Ms. Shursky reported directly to her Vice President.

96.     Ms. Shursky won the Vice President's Club Award for her performance in 2009. The following year, Ms. Shursky continued to exceed expectations.   Merck gave her an exceptional performance review for 2010 and praised her outstanding customer care, depth of knowledge and "natural leadership skills."   The review explicitly stated that Ms. Shursky's outstanding performance had qualified her for an S3 position.

97.     Ms. Shursky began working as a Senior Disease Focus Respiratory Representative in Scranton, Pennsylvania in January 2010.

#### 2.   Merck Paid Ms. Shursky Less Than Similarly Situated Male Employees, Denied Her Promotions, and Accorded Her Fewer Promotional Opportunities.

98.     Despite her skills and qualifications, Merck discriminated against Ms. Shursky because of her gender and because she was and had been pregnant.  For example, Merck denied

her promotions and promotional opportunities, gave her unfair performance evaluations and subjected her to other discriminatory actions that have stalled her career and harmed her professional reputation.

99.     Upon information and belief, Merck paid Ms. Shursky less than similarly situated male employees.

100.    Additionally, during the March 2011 reorganization and while she was on maternity leave, Merck assigned Ms. Shursky to the S2 position, even though she was eligible for the S3 position of Business Analytical Planner.  Ms. Shursky was particularly qualified for this position, as she consistently received positive feedback on her business analytical skills, and had spent four years at Merck working as an Analyst.  However, Merck instead assigned a male employee to this position.

101.    Upon information and belief, Ms. Shursky's Director of Commercial Operations Todd Andrade ("Director Andrade") favors male sales representatives, believing that they are breadwinners and that women with families should not work outside the home.  Additionally, Ms. Shursky had been informed by her previous manager that Merck senior leadership was less likely to hire a pregnant woman.

102.    Furthermore, Ms. Shursky's manager, Customer Team Leader Lisa Griesemer ("Manager Griesemer"), who had informed her of Director Andrade's preference for male breadwinners, told Ms. Shursky that the S3 assignment was "probably not good timing with you going on maternity leave."

103.    Merck again denied Ms. Shursky an S3 assignment in 2013.  In August, Merck announced that an S3 position would soon be available; however, Manager Griesemer told Ms. Shursky that Director Andrade or other members of Merck senior management may not allow an employee in a job share arrangement to be placed in the S3 tier, and told her it "might not be

good timing" because of Ms. Shursky's maternity leave.  Despite her explicit requests, Merck did not inform Ms. Shursky when the S3 slot became available, and on December 4, 2013, Merck announced that a male candidate was assigned to the S3 tier instead.

### 3. Merck Discourages Ms. Shursky from Continuing to Work Following Her Maternity Leave.

104.    Ms. Shursky returned from maternity leave in September 2011.  In or around October 2011, she asked Merck about a job share arrangement.  Manager Griesemer told Ms. Shursky she should consider quitting her work altogether, stating, "maybe that's the best thing to do."  Manager Griesemer later informed Ms. Shursky that Director Andrade would likely not approve such an arrangement due and may eliminate Ms. Shursky's position altogether due to his belief that women with children should not work outside the home.  Ms. Shursky nevertheless requested a job share arrangement, which Merck senior management denied in 2011 and approved in 2013.  Before it would approve her job share arrangement after her second maternity leave in 2013, Merck secured Ms. Shursky's agreement to work in a less-prestigious position.

105.    Merck also gave Ms. Shursky a negative performance review for 2011, the year she had been on maternity leave.  Although Manager Griesemer praised Ms. Shursky's exceptional skill and knowledge, Merck nevertheless reviewed her as having "delivered below objectives" and rated her as "Needs Development" in several areas, including categories that Manager Griesemer had praised her on just weeks earlier.  Manager Griesemer admitted that Merck had based Ms. Shursky's rating on the fact that it had been a "choppy" year for Ms. Shursky "because of [her] maternity."

106.    As a result of Merck's discrimination, Ms. Shursky suffered and continues to suffer from high levels of stress and anxiety.

E.      KATE WHITMER'S FACTUAL ALLEGATIONS

     **1.**     **Ms. Whitmer Earned Accolades for Her Performance.**

107.    Ms. Whitmer started working at Merck in July 2005 as an Associate Sales Representative.  She was promoted to an Adult Immunization Professional position in 2006 and an Adult Immunization Professional II position in 2008.

108.    In March 2011, Merck assigned Ms. Whitmer to Executive Vaccine Representative and placed her in the S2 tier.  Ms. Whitmer remained an S2 until her constructive discharge in January 2012.

109.    When Ms. Whitmer joined Merck in July 2005, she had two years of work experience and a graduate-level education in management, having earned a Bachelor of Science in March 2003 from California State University, Pomona and a Master's Degree in Business Administration in May 2005 from California Lutheran University.

110.    At Merck, Ms. Whitmer achieved exceptional results and distinguished herself as a top performer.  Of the more than 100 vaccine sales representatives in her region, Ms. Whitmer consistently ranked in the top 30% for sales performance and the top 20% for leadership potential.

     **2.**     **Merck Paid Ms. Whitmer Less Than Male Employees For the Same Work, Denied Her Promotions, and Afforded Her Fewer Promotional Opportunities.**

111.    Despite her strong performance, Merck paid Ms. Whitmer less than male sales representatives in the same jobs who performed the same duties under the same working conditions.  Upon information and belief, Merck paid male employees performing the same jobs as Ms. Whitmer, such as Roget Nahapetian and Lindley Kistler, approximately $20,000 to $45,000 more than it paid Ms. Whitmer.  In fact, Merck paid Ms. Whitmer a lower salary than Mr. Kistler even though he was in the S1 tier and Ms. Whitmer was in the higher S2 tier.

112.    Additionally, two to three times in 2007 and 2008, Merck awarded a male counterpart performing the exact same job as Ms. Whitmer bonuses three times as high as the bonuses it awarded to Ms. Whitmer, even though their performance numbers were exactly the same.

113.    Merck also denied Ms. Whitmer promotions and promotional opportunities.  In January 2011, when Ms. Whitmer was about seven months pregnant, Merck's policies and practices prevented Ms. Whitmer from applying for a pharmacy-related sales position in the higher S3 tier.  While Ms. Whitmer was qualified for the position based on her work developing and training employees on a new method of selling vaccines to pharmacies, Ms. Whitmer's Director of Commercial Operations Phil Beasley, along with Customer Team Leader Erle Wynn ("Manager Wynn"), refused to allow Ms. Whitmer to interview for the position.  Instead, Merck filled the position with a less qualified, non-pregnant female employee who, upon information and belief, had not raised complaints of discrimination.

114.    Merck also denied Ms. Whitmer's applications to three specialty positions.  Ms. Whitmer applied to and was subsequently rejected from a position on the hospital team in 2010, a position in Merck's ophthalmology division in February 2011 and a position as a public sector manager in November 2011.

115.    On multiple occasions, Ms. Whitmer asked Merck for more prestigious assignments and complained that the company was instead giving such assignments to less-qualified male employees who lacked her demonstrated performance and leadership capabilities. For example, Merck failed to assign Ms. Whitmer to roles that would have made her responsible for working closely with other representatives and managers.  While Ms. Whitmer was qualified for these roles, Merck almost always assigned these roles to male employees.  On one occasion,

Merck assigned a leadership role to a male employee who had joined the team only weeks earlier and who was less qualified for the role than Ms. Whitmer.

116.    Merck also gave Ms. Whitmer a negative performance review when she returned from leave in 2011, adversely affecting her bonus compensation.  While Ms. Whitmer had not previously received a negative review, Merck now ranked her competency score near the bottom of possible scores.  Manager Wynn explained that Merck had given Ms. Whitmer a low score because she had been on maternity leave.

117.    Ms. Whitmer responded by pointing out that she had been successfully performing the tasks of both a pediatric and a primary care vaccine representative and that she had performed above and beyond what Merck expected of her, even meeting with clients while she was on maternity leave to ensure that Merck did not lose an account.  When Ms. Whitmer told Manager Wynn that Merck was punishing her for taking maternity leave, and he responded that "this is just how it is."

118.    Merck also denied Ms. Whitmer the Director's Club Award in 2008, even though she should have received the award based on her performance.  Instead, Merck gave the award to a male employee with lower sales numbers and fewer leadership responsibilities than Ms. Whitmer.  Although Ms. Whitmer complained to Human Resources, the company refused to take any remedial action.

### 3.    Merck Senior Management Failed to Address Ms. Whitmer's Complaints and Retaliated Against Her.

119.    Ms. Whitmer complained repeatedly that she was underpaid relative to her male comparators, but Merck failed to address this discrimination.  Ms. Whitmer also attempted to raise these complaints by calling Merck's Human Resources hotline on numerous occasions in 2008 and 2009, but she never received a response.

120.    Ms. Whitmer also raised complaints about Manager Wynn to his supervisor, Director of Commercial Operations Chris Bianco ("Director Bianco") in mid-2008.   Director Bianco told Ms. Whitmer that other employees had also complained about Manager Wynn.

121.    In September 2008, Director Bianco held a meeting with Manager Wynn and members of his team to address the complaints about Manager Wynn.   During this meeting, Director Bianco instructed employees to write their complaints about Manager Wynn on note cards.   Employees were asked to discuss their complaints with Manager Wynn.   Ms. Whitmer again told Manager Wynn she was frustrated by his dismissive reactions to her performance. Other women also complained that Manager Wynn treated female employees less favorably than male employees.   Upon information and belief, after this meeting, Director Bianco failed to follow up on these complaints and never discussed them with Manager Wynn.

122.    In early 2009, Ms. Whitmer told Director Bianco that Manager Wynn's behavior had not changed since the September 2008 meeting.   Director Bianco told Ms. Whitmer that her team was "just a bunch of whiners" and told Ms. Whitmer to confront Manager Wynn herself. Ms. Whitmer expressed her reluctance to confront Manager Wynn outside the presence of a Merck Human Resources employee trained in addressing such complaints.   Director Bianco again told Ms. Whitmer she had to address the complaints herself and refused to involve Human Resources, telling Ms. Whitmer it was "too late to go to Human Resources."

123.    Ms. Whitmer met with Manager Wynn in March 2009.   Because Director Bianco refused to allow Human Resources or Merck management to become involved, Ms. Whitmer asked one of her colleagues to accompany her to the meeting.

124.    Ms. Whitmer had gathered comments from her team members, and she conveyed these comments to Manager Wynn.   Specifically, Ms. Whitmer complained that Manager Wynn

treated female employees differently from male employees; addressed women in a derogatory manner, such as calling them "hon" or "sweetheart"; and used inappropriate language.

125. Following her meeting with Manager Wynn, Ms. Whitmer again asked Director Bianco to involve Human Resources.  Ms. Whitmer also told Director Bianco that Manager Wynn's conduct was illegal and could result in a lawsuit.

126. In response, Director Bianco told Ms. Whitmer that she would be the "only one" that could "take [him] down."  He asked her to "lie" to Human Resources if the department contacted her and tell them that Director Bianco "didn't know how bad it was."  Director Bianco also asked Ms. Whitmer for her notes from the meeting with Manager Wynn and asked her to rewrite her notes to exclude mention of Director Bianco's knowledge of the discrimination.

127. Due to his disparate treatment of his male and female team members, other female employees began referring to Director Bianco's team as the "Texas Good Ol' Boys' Club."

### 4.    Merck Constructively Discharged Ms. Whitmer.

128. In early November 2011, Ms. Whitmer forwarded a file to a customer that, due to an error by Merck's Information Technology Department, contained information that the customer should not have seen.  Ms. Whitmer immediately apologized to the customer and notified Manager Wynn, who did not raise any concerns about the incident.  Ms. Whitmer later learned from Human Resources that the error was "no big deal" and would have "zero effect" on her bonus pay or her job.

129. Two weeks after the incident, however, Manager Wynn informed Ms. Whitmer that Director Beasley had reported her to Human Resources and that she was "under investigation" as a result.  Manager Wynn also informed Ms. Whitmer and that Merck might terminate her employment.   Manager Wynn's threats that Merck would terminate her employment caused Ms. Whitmer became very concerned that she was going to lose her job.

She was unable to sleep and could not focus.  She was often sick to her stomach and her hair began to fall out.

130.     In December 2011, Ms. Whitmer called Manager Wynn to learn the status of the HR investigation.  She told him about the health problems that the stress of the situation was causing her.  She also told him that she felt it was unfair that employees had complained of Manager Wynn's discriminatory behavior for years and he had never faced any discipline, yet she was now facing potential termination due to a minor incident.   Manager Wynn responded that this conversation was "over" and hung up on her.

131.     Shortly after disconnecting their call, Manager Wynn texted Ms. Whitmer to tell her that Human Resources would contact her and that she must not contact HR.  Ms. Whitmer later learned, however, that Manager Wynn had instructed HR not to contact Ms. Whitmer.

132.     Unable to tolerate the stress imposed by her manager and Merck Human Resources and the threat of investigation hanging over her head for months, Ms. Whitmer felt that she had no choice but to leave Merck.  Her last day of employment was January 12, 2012.

133.     As a result of Merck's discrimination and continuing retaliation, Ms. Whitmer has suffered and continues to suffer from high levels of stress and anxiety.

## V.     CLASS ACTION ALLEGATIONS

**Centralized Decision-Making, Ineffective Human Resources Functions and
Discriminatory Corporate Culture**

134.     Merck's compact and predominantly male senior leadership team maintains centralized control over the sales employees' terms and conditions of employment, including job assignment, career progression, promotion, discipline, demotion, evaluations, reorganizations/realignments, territory and growth potential/account assignments, and compensation policies, practices, and procedures.

135.   Upon information and belief, Merck's predominately male senior leadership is responsible for reviewing and approving the acts, policies, and practices that have a disparate impact on female employees or result in systematic disparate treatment of women.  Merck's senior leadership is responsible for ranking sales representatives on a forced curve, assigning competency scores, and approving performance evaluations, which are used in determining compensation.   Senior leadership exploits its power to discriminatorily award or deny compensation, including bonuses, awards and salary increases.

136.   Additionally, Merck's senior leadership team awards promotions based on a tap-on-the-shoulder and personal relationships rather than merit.

137.   Merck, in effect, bars female sales representatives from better and higher-paying positions, which have traditionally been held by male employees.  The systematic means of accomplishing such gender-based stratification include, but are not limited to, Merck's assignment, career progression, promotion, discipline, demotion, termination, evaluation, reorganizations/realignments, territory and growth potential/account assignments, and compensation policies, practices, and procedures.  These practices and procedures all suffer from a lack of: transparency; adequate quality standards and controls; sufficient implementation metrics; management/HR review; and opportunities for redress or challenge.  As a result, employees are assigned, evaluated, compensated, developed, promoted, and terminated within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or equitably manage or reward employees.

138.   Within these flawed structures, specific policies and practices negatively affect female sales employees.  For example, Merck's common and centralized employment policies have been implemented in an intentionally discriminatory manner and have had an adverse disparate impact on female sales representatives.   Merck's centralized decision-making by

predominately male executives and senior sales leadership has been implemented in an intentionally discriminatory manner and has had an adverse disparate impact on female sales representatives.  Merck's realignments/restructurings and/or layoffs, management structure, and resource allocation has been implemented in an intentionally discriminatory manner and has had an adverse disparate impact on female sales representatives.  Such policies, practices, and procedures are not valid, job-related, or justified by business necessity.

139.    Without the appropriate standards, guidelines, or transparency necessary to ensure an equitable workplace, unfounded criticisms may be lodged against sales representatives who are female, pregnant, or mothers, and illegitimate criticisms may be given undue weight. Moreover, taking leave for pregnancy and caretaking reasons can constitute a negative factor in employees' evaluations, compensation, and promotion prospects.  Merck's HR and senior management have failed to curb a corporate culture that presumes that women who are or have been pregnant or taken leave are less dedicated or productive.

140.    These problems are systematic and company-wide because, upon information and belief, they all stem from flawed policies, practices, and procedures that emanate from the company's centralized predominantly male leadership team.

141.    Merck has failed to impose adequate discipline on employees who violate equal employment opportunity laws and has failed to create adequate incentives for its managerial and supervisory personnel to comply with such laws regarding the employment policies, practices, and procedures described above.

142.    Thus, Merck tolerates and even cultivates a hostile environment in which women generally and women who are or have been pregnant particularly are openly devalued and where (a) retaliation for voicing gender discrimination complaints is the norm, and (b) women and

mothers who question or even inadvertently disrupt the company's gendered norms are routinely pushed out.

143.   Merck's discriminatory policies and practices have subjected female employees to continuing unlawful disparate treatment and have had a continuing, unlawful disparate impact on them and their employment opportunities.  Such gender and pregnancy discrimination includes (a) assigning female and pregnant employees to lower classifications than similarly situated male employees performing the same job duties; (b) paying female and pregnant employees less than their male counterparts and (c) denying female and pregnant employees development, promotion and advancement opportunities resulting in their relegation to lower classification and compensation levels; (d) failing to prevent, respond to, adequately investigate and/or appropriately resolve instances of gender discrimination and pregnancy discrimination in the workplace; (e) treating pregnant employees and female employees with children differently from non-pregnant employees and male employees with and without children; (f) creating a hostile work environment; and (g) otherwise subjecting female employees generally and female employees who are pregnant or have children in particular to disparate treatment with respect to the terms and conditions of their employment through exposure to pregnancy and gender-based discrimination, sexual harassment and a hostile work environment with no avenues for recourse. The gender discrimination also involves retaliation against female and pregnant employees who have complained of wage disparity, gender discrimination and sexual harassment through internal reporting channels, the filing of EEOC complaints, and hiring counsel, including by unfairly demoting them, taking unwarranted disciplinary measures, subjecting them to increased scrutiny or otherwise altering their terms and conditions of employment.

144.   Merck's compensation, development, promotion, advancement, award, training and performance evaluation policies, practices and procedures incorporate the following

discriminatory practices: (a) refusing or failing to establish and/or follow policies, practices, procedures or criteria that reduce or eliminate disparate impact and/or intentional biases or stereotypes and (b) refusing or failing to provide equal training opportunities to female employees generally and to female employees who are pregnant or have children in particular.

145.    Where HR and Ombuds complaint and compliance policies exist, they lack meaningful quality controls, standards, implementation metrics and means of redress, such that upper management and HR may ignore, disregard, minimize, cover up, mishandle or otherwise fail to respond properly to evidence of discrimination in the workplace.  There is no meaningful separation between complaint reporting channels and the managers who create discriminatory or hostile working conditions for women, such that complaints do not remain confidential and victims of discrimination often face retaliation or are dissuaded from raising concerns altogether. Moreover, HR and management have contributed to and failed to curb a corporate culture that presumes men, not women, are "breadwinners" for their families.

146.    Further, Merck demonstrates a reckless disregard—a deliberate indifference—to discrimination against its female employees generally and its female employees who are pregnant or have children in particular by overlooking or otherwise dismissing even blatant evidence of gender and pregnancy discrimination.

147.    Merck's assignment, development, compensation, promotion, training, evaluation, personnel management, termination, maternity, awards and complaint policies, practices and procedures have a disparate impact on the Class Representatives and the Class they seek to represent.  Such policies, practices and procedures are not valid, job-related or justified by business necessity.

148.    Indeed, the facts demonstrate that it is Merck's standard operating procedure to discriminate against female and pregnant employees on a mass scale.  Merck's assignment,

development, compensation, promotion, training, evaluation, personnel management, termination, maternity, awards and complaint policies, practices and procedures form a part of the Defendant's overall pattern and practice of keeping women in the lower classifications that carry less desirable terms and conditions of employment.

149.    Class Representatives represent a Class consisting of all female sales representatives who are, have been, or will be employed by Merck & Co., Inc. since December 2010.  The Class Representatives and the Class of Merck employees they seek to represent have been subjected to a systemic pattern and practice of gender discrimination and disparate impact gender discrimination by Merck.

150.    Class Representatives also represent a Sub-Class consisting of all female sales representatives at Merck who are, have been or will be pregnant or have children since December 2010.

151.    Because of Merck's systemic pattern and practice of gender discrimination, the Class Representatives and Class they seek to represent have been adversely affected and have experienced harm, including the loss of compensation, wages, back pay, and employment benefits as well as physical and emotional pain and suffering.

152.    The Class Representatives and the Class have no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and this suit is their only means of securing adequate relief.  The Class Representatives and the Class are now suffering, and will continue to suffer, irreparable injury from Merck's ongoing, unlawful policies, practices and procedures as set forth herein unless those policies, practices and procedures are enjoined by this Court.

**A.  General Facts Relevant To Class Claims And Class Definition**

153.    Class Representatives seek to maintain claims on their  own behalf and on behalf of a) a Class of female employees who are or were employed at Merck as sales representatives in

Merck from December 2010 to the present; and b) a Sub-Class of female employees at Merck from December 2010 to the present who are or were pregnant or have children.

154.    Upon information and belief, the members of the proposed Class number in the thousands and the members of the proposed Sub-Class number in the hundreds.

155.    The Class Representatives seek to represent all of the female employees described above.  The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

**B.  Efficiency Of Class Prosecution Of Common Claims**

156.    Certification of a class of female employees and a subclass of female employees who are or were pregnant or have children is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Class Representatives and the Class.  The individual claims of Class Representatives require resolution of the common questions concerning whether Merck has engaged in a systemic pattern and/or practice of gender discrimination against female employees and/or whether its facially neutral policies have an adverse effect on the Class.  Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers and working conditions and in the lives, careers and working conditions of the Class members, and to prevent Merck's continued gender discrimination.

157.    Class Representatives have standing to seek such relief because of the adverse effects that such discrimination has had on them individually and on female employees generally.  Merck caused their injuries through its discriminatory practices, policies and procedures, as well as its disparate treatment of employees who are female and/or pregnant.

158.   To gain such relief for themselves, as well as for the Class members, the Class Representatives will first establish the existence of systemic gender discrimination at Merck as the premise for the relief they seek.

159.   Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed class of female sales representatives is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the proposed Class and the Defendant.

**C.  Numerosity And Impracticability Of Joinder**

160.   The Class and Sub-Class that Class Representatives seek to represent are too numerous to make joinder practicable.  On information and belief, the proposed Class consists of thousands of current and former employees during the liability period, and the proposed Sub-Class consists of hundreds of current and former employees during the liability period.

**D.  Common Questions Of Law And Fact**

161.   The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to her claims and those of the Class she seeks to represent.  The common questions of law include: (a) whether Merck has engaged in unlawful, systemic gender discrimination in its compensation, performance evaluation, ranking, promotion, advancement and discipline policies, practices and procedures, and in the general terms and conditions of work and employment; (b) whether the failure to institute adequate standards, quality controls, implementation metrics, or oversight in assignment, development, compensation, promotion, training, evaluation, personnel management, termination, maternity, awards and complaint policies, practices and procedures violates Title VII and/or other statutes; (c) whether the lack of transparency and of opportunities for redress in those systems violates

Title VII and/or other statutes; (d) whether the failure of upper management and HR to prevent, investigate or properly respond to evidence and complaints of discrimination in the workplace violates Title VII and other statues; (e) whether Merck is liable for a continuing systemic violation of Title VII, and other statutes; (f) a determination of the proper standards for proving a pattern or practice of discrimination by Merck against its female sales employees under the disparate treatment theory of liability; and (g) a determination of the proper standard for proving that facially neutral employment practices at Merck had a disparate impact on the Class and Sub-Class.

162.    The common questions of fact include: whether Merck has, through its policies, practices and procedures: (a) used a system of assignment that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (b) through the use of that system of assignment placed female employees in job titles or classifications lower than similarly situated male employees; (c) systemically, intentionally or knowingly placed female employees in job titles or classifications lower than similarly situated male employees; (d) used a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (e) through the use of that compensation system compensated female employees less than similarly situated male employees in salary and/or other perks; (f) systemically, intentionally or knowingly compensated female employees less than similarly situated male employees; (g) used a system of development and mentoring that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (h) through the use of that development and mentoring system failed to develop or provide opportunities for development to female employees in a commensurate manner to their similarly situated male counterparts; (i) systematically, intentionally or knowingly failed to develop or provide opportunities for

development to female employees in a commensurate manner to their similarly situated male counterparts; (j) used a promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (k) through the use of that promotion system precluded or delayed the promotion of female employees into higher jobs traditionally held by male employees; (l) systematically, intentionally or knowingly precluded or delayed the selection and promotion of female employees into higher level jobs traditionally held by male employees; (m) used a system for performance evaluations that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency or opportunities for redress; (n) through the use of that performance evaluation system inaccurately, unfairly or disparately measured, classified and compared female and male employee performance; (o) systematically, intentionally or knowingly subjected female employees to inaccurate, unfair or discriminatorily critical or lowered performance evaluations; (p) used maternity policies, practices and procedures that lack meaningful or appropriate standards, implementation metrics, quality controls, transparency or opportunities for redress; (q) through the use of those policies, practices and procedures treated female employees who are or were pregnant or have children differently and discriminatorily from male employees with and without children and female employees who are not pregnant and do not have children; (r) systematically, intentionally or knowingly subjected pregnant employees to disparate and discriminatory terms and conditions of employment; (s) used HR and Ombuds systems that lack meaningful or appropriate standards, implementation metrics, quality controls, transparency, or opportunities for redress; (t) relying upon and using these systems, minimized, ignored or covered-up evidence of gender discrimination and harassment in the workplace and/or otherwise mishandled the investigation of and response to complaints of discrimination and harassment brought to the attention of senior management or the Human Resources department; (u)

41

systematically, intentionally, knowingly or deliberately sowed an indifference to evidence of discrimination in the workplace or otherwise minimized, ignored, mishandled or covered up evidence of or complaints of gender and pregnancy discrimination (v) retaliated against those who have complained of gender-based discrimination through techniques including but not limited to demotions, unwarranted disciplinary measures, negative performance reviews, and increased scrutiny; and (w) otherwise discriminated against women, pregnant women and women with children in the terms and conditions of employment.

163.    Merck compensated female employees less than similarly situated males; precluded or delayed the selection and promotion of female employees into higher level jobs; retaliated against those who have complained of gender-based discrimination through techniques including but not limited to unwarranted disciplinary measures, negative performance reviews and increased scrutiny; and otherwise discriminated against women generally and pregnant women and women with children in particular in the terms and conditions of employment.

164.    The employment policies, practices and procedures to which the Class Representatives and the Class and Sub-Class members are subjected are set at Merck's corporate level and apply universally to all Class and Sub-Class members.  These employment policies, practices and procedures are not unique or limited to any district; rather, they apply to all districts and, thus, affect Class Representatives and Class and Sub-Class members in the same ways regardless of the district in which they work.

165.    Throughout the liability period, a disproportionately large percentage of the managers, executives and officers at Merck have been male employees or female employees who were not pregnant and did not have children.

166.    Discrimination in selection, promotion and advancement occurs as a pattern or practice throughout management in all business units of Merck.  Assignment, selection,

promotion and advancement opportunities are driven by personal familiarity, subjective decision-making, pre-selection and interaction between male executives and subordinates rather than by merit or equality of opportunity.  These polices, practices and procedures all suffer from a lack of transparency, adequate quality standards and controls, sufficient implementation metrics, upper management/HR review and opportunities for redress or challenge.  As a result, employees are assigned, evaluated, compensated, developed and promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly manage or reward employees.

167.    As a result, male employees and non-pregnant employees have advanced and continue to advance more rapidly to better and higher-paying jobs than female employees and pregnant employees.

168.    Merck's policies, practices and procedures have had an adverse impact on and have resulted in routine adverse disparate treatment of on female employees seeking selection for, or advancement to, better and higher-paying positions.  On information and belief, the higher the level of the job classification, the lower the percentage of female employees holding it.

169.    As a result, male managers and female managers without children have a disproportionate say in the assignment, development, evaluation and compensation of female employees.  Female employees are routinely undervalued and their work product minimized and disregarded, resulting in significant implications not only for their advancement opportunities but also for their compensation.

170.    Because Merck's personnel management systems do not provide sufficient oversight or safety measures to protect against intentional and overt discrimination or the disparate impact of even facially neutral policies and procedures, female employees suffering from discrimination are without recourse.  In addition, the absence of a check on discrimination

extends to retaliatory actions, leaving victims of discrimination doubly vulnerable.  As such, Merck fosters and condones discrimination.

### E.  Typicality Of Claims And Relief Sought

171.    The claims of the Class Representatives are typical of the claims of the Class and Sub-Class.  The relief sought by Class Representatives for gender and pregnancy discrimination complained of herein is also typical of the relief that is sought on behalf of the Class and Sub-Class.

172.    Like the members of the Class and Sub-Class, the Class Representatives are female employees who were pregnant and had children and worked at Merck during the liability period.

173.    Discrimination in assignment, promotion, development, selection, training, evaluations and HR oversight affects the compensation, advancement and overall treatment of the Class Representatives and all employee class members in the same or similar ways.

174.    Merck has failed to create adequate incentives for its executives and managers to comply with its own policies and equal employment opportunity laws regarding each of the employment policies, practices and procedures referenced in this Complaint, and has failed to discipline adequately its executives, managers and other employees when they violate Company policy or discrimination laws.  These failures have affected the Class Representatives and the Class members in the same or similar ways.

175.    By tying the compensation of representatives and managers to product sales goals—without amending these goals to account for female sales representatives' being out on maternity leave—Merck creates an environment where employees and managers have incentives to discriminate against women who do or may take maternity leave.

176.    Merck has further failed to respond adequately or appropriately to evidence of discrimination and harassment, and complaints or concerns raised about the same.  These failures have affected the Class Representatives and the Class members in the same or similar ways.

177.    The relief necessary to remedy the claims of the Class Representatives is exactly the same as that necessary to remedy the claims of the Class members in this case.  Class Representatives seek the following relief for their individual claims and for those of the members of the proposed Class: (a) a declaratory judgment that Merck has engaged in systemic gender discrimination against the Class by (1) paying female employees and female employees who are pregnant or who have children less than their male counterparts, (2) denying these employees promotion into better and higher-paying positions (3) discriminating against female employees, pregnant women and women with children, and (4) otherwise failing to investigate or respond to evidence of discrimination or harassment in the workplace; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effectuates a restructuring of Merck's promotion, training, performance evaluation, compensation and discipline policies, practices and procedures—so that women at Merck will be able to compete fairly in the future for promotions, transfers and assignments to better and higher-paying classifications with terms and conditions of employment traditionally enjoyed by male employees, and so that they may if necessary raise concerns about discrimination without fear of retaliation; (d) back pay, front pay and other equitable remedies necessary to make the employees whole from the Defendant's discrimination; (e) punitive and nominal damages to prevent and deter Merck from engaging in similar discriminatory practices in the future; (f) compensatory damages; and (g) attorneys' fees, costs and expenses.

45

### F. Adequacy Of Representation

178.    The Class Representatives' interests are co-extensive with those of the Class and Sub-Class they seeks to represent in this case.   The Class Representatives seek to remedy Merck's discriminatory employment policies, practices and procedures so that female employees generally and female employees who are pregnant or have children in particular will no longer be prevented from advancing into higher-paying and higher ranked positions at Merck.

179.    The Class Representatives are willing and able to represent the Class and Sub-Class fairly and vigorously as they pursue their claims in this action.

180.    Class Representatives have retained counsel who are qualified, experienced and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.   The combined interests, experience and resources of counsel to litigate competently the individual and class claims at issue in this case satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### G. Requirements Of Rule 23(b)(2)

181.    Merck has acted on grounds generally applicable to the Class Representatives and the Class by adopting and following systemic policies, practices and procedures that are discriminatory.   Gender discrimination is Merck's standard operating procedure rather than a sporadic occurrence.

182.    Merck has refused to act on grounds generally applicable to the Class by, inter alia: (a) failing to pay female and/or pregnant employees on par with similarly situated male and non-pregnant employees; (b) failing to promote female and/or pregnant employees on par with similarly situated male and non-pregnant employees (c) assigning female employees and employees who are pregnant or who have children to job titles and classifications lower than

46

appropriate for their actual job duties and responsibilities; (d) denying female employees and employees who are pregnant or who have children promotion and advancement opportunities in favor of male employees; (e) failing to prevent, respond to, adequately investigate and appropriately resolve claims of gender and pregnancy discrimination; (f) refusing to adopt and apply selection, promotion, training, performance evaluation, compensation, Human Resources, corporate leadership and discipline policies, practices and procedures that do not have a disparate impact on, or otherwise systemically discriminate against, female employees; and (g) refusing to provide equal terms and conditions of employment for female employees, for pregnant women and for women with children.

183.    Merck's policies, practices and procedures of assignment, development, promotion, advancement, compensation, awards and performance evaluations have resulted in gender discrimination and stratification.  Merck's systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the Class as a whole.

184.    Injunctive, declaratory and affirmative relief are the predominant forms of relief sought in this case.  Entitlement to declaratory and injunctive relief flows directly and automatically from proof of systemic gender discrimination by Merck.

185.    In turn, entitlement to declaratory and injunctive relief forms the factual and legal predicate for recovery by the Class Representatives and Class members of monetary and nonmonetary remedies for individual losses caused by the systemic discrimination, as well as their recovery of nominal and punitive damages.

### H.  Requirements Of Rule 23(b)(3)

186.    The common issues of fact and law affecting the claims of the Class Representatives and proposed class members, including, but not limited to, the common issues

previously identified herein, predominate over any issues affecting only individual claims. These common issues include whether Merck has engaged in gender discrimination against female employees and employees who are pregnant or who have children by (a) assigning female employees to lower job titles and classifications than their male counterparts; (b) paying female employees less than their male counterparts; (c) denying female employees promotion and advancement opportunities in favor of male employees; (d) treating pregnant employees and women with children differently from non-pregnant or childless female employees and male employees; (e) failing to prevent, respond to, investigate adequately or respond appropriately to instances of gender discrimination; and (f) tolerating and promoting a culture of gender discrimination directed against female employees in general and female employees who are pregnant or have children in particular.

187. A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representatives and members of the proposed class.

188. The cost of proving Merck's pattern and practice of discrimination makes it impracticable for the Class Representatives and members of the proposed class to prosecute their claims individually.

189. By virtue of the pattern and practice of discrimination at Merck, the Class Representatives and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including backpay, frontpay, compensatory damages and other nominal and punitive damages.

## VI.  COLLECTIVE ACTION ALLEGATIONS UNDER THE EQUAL PAY ACT

190. Plaintiffs Kelli Smith, Kandice Bross, Rachel Mountis, and Kate Whitmer incorporate by reference the allegations from the previous paragraphs of this Complaint alleging class-based discrimination against female employees.

**A. Collective Action Standards**

191.    Plaintiffs bring collective claims under the Equal Pay Act ("EPA") pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective Action Class, which consists of current, former, and future female Merck sales representatives during the applicable liability period, including until the date of judgment.  The EPA action includes female employees (a) who were not compensated equally to male employees who had substantially similar job classifications, functions, titles and/or duties, (b) who were not compensated equally to male employees who performed substantially similar work and/or (c) who were denied equal compensation to similarly situated male employees by being hired into positions at lesser grades than male employees who performed substantially similar work.

192.    Questions of law and fact common to the EPA Collective Action Plaintiffs as a whole include but are not limited to the following:

a.  Whether Defendant unlawfully failed and continues to fail to compensate female employees at levels commensurate with similarly situated male employees;

b.  Whether Defendant unlawfully assigned and continues to assign female employees into positions graded at a lower pay and compensation scale to similarly qualified males;

c.  Whether Defendant's policy and practice of failing to compensate female employees on a par with comparable male employees as a result of (a) and (b) violates applicable provisions of the EPA; and

d.  (d)    Whether Defendant's failure to compensate female employees on a par with comparable male employees as a result of (a) and (b) was willful within the meaning of the EPA.

49

193.    Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiffs who opt-in to this action because the claims of the Plaintiffs are similar to the claims of the EPA Collective Action Class.

194.    Plaintiffs and other employees who will opt-in are (a) are similarly situated; (b) have substantially similar job classifications, functions, titles and/or duties; and (c) are subject to Defendant's common policy and practice of gender discrimination in (i) failing to compensate female on par with men who perform substantially equal work and/or hold equivalent levels and positions; (ii) failing to provide female employees with job classifications, grades and titles commensurate with male employees who perform substantially equal work and/or have similar duties and responsibilities; (iii) hiring and assigning females into lower-level positions than male employees who perform substantially equal work and/or have similar or lesser experience and qualifications; and (iv) failing to provide female employees equal pay by denying opportunities for promotion and advancement to them comparable to those afforded to male employees who perform substantially equal work.

## VII.   COUNTS

### COUNT I
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"),
42 U.S.C. § 2000e, *et seq.*
Pay Discrimination
(On Behalf of Plaintiffs Smith, Bross, Mountis, Shursky and Whitmer and All Class
Members)**

195.    Class Representatives Smith, Bross, Mountis, Shursky and Whitmer re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

196.    This Count is brought on behalf of the Class Representatives Smith, Bross, Mountis, Shursky and Whitmer and all members of the Class.

197.    Defendant has discriminated against Class Representatives and all members of the Class in violation of Title VII by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendant's wrongful conduct and its policies, practices and procedures.

198.    Defendant has discriminated against Class Representatives and all members of the Class by subjecting them to discriminatory compensation, denials of pay raises, bonuses and awards, and discriminatory rankings and performance evaluations and rankings that affect pay, in violation of Title VII.

199.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

200.    As a result of Defendant's conduct alleged in this complaint, Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

201.    By reason of Defendant's discrimination, Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

202.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT II
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"),
### 42 U.S.C. § 2000e, *et seq.*
### Promotion Discrimination
### (On Behalf of Plaintiffs Smith, Bross, Mountis, Shursky and Whitmer and All Class Members)

203.   Class Representatives Smith, Bross, Mountis, Shursky and Whitmer re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

204.   This Count is brought on behalf of Class Representatives Smith, Bross, Mountis, Shursky and Whitmer and all members of the Class.

205.   Defendant has discriminated against Class Representatives and all members of the Class in violation of Title VII by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendant's wrongful conduct and Merck's policies, practices and procedures.

206.   Defendant has discriminated against the Class Representatives and all members of the Class by treating them differently from and less preferably than similarly situated male employees, and by subjecting them to discriminatory denials of promotions, discriminatory denials of developmental opportunities and discriminatory performance evaluations that affect promotions in violation of Title VII.

207.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling Class Representatives and the members of the Class to punitive damages.

208.   As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm,

including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

209.   By reason of Defendant's discrimination, Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

210.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k)

## COUNT III
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000e, *et seq*.
### Pregnancy and Sex Plus Discrimination
### (On Behalf of Plaintiffs Smith, Bross, Mountis, Shursky and Whitmer and All Sub-Class Members)

211.   Class Representatives Smith, Bross, Mountis, Shursky and Whitmer re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

212.   This Count is brought on behalf of Class Representatives Smith, Bross, Mountis, Shursky, Whitmer and all members of the Sub-Class.

213.   Defendant has discriminated against Class Representatives and all members of the Sub-Class in violation of Title VII by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendant's wrongful conduct and its policies, practices and procedures.

214.   Defendant has discriminated against the Sub-Class members bringing this claim by treating them differently from and less preferably than similarly situated male employees and female employees who are not pregnant and who do not have children, and by subjecting them differential and substandard terms and conditions of employment including but not limited to discriminatory denials of fair compensation, discriminatory denials of promotional opportunities

53

and discriminatory treatment with respect to leave, work responsibilities and other terms and conditions of employment in violation of Title VII.

215.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Class Representatives and the members of the proposed Sub-Class, entitling the Class Representatives and the members of the Sub-Class to punitive damages.

216.   As a result of Defendant's conduct alleged in this complaint, Class Representatives and the members of the Sub-Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

217.   By reason of Defendant's discrimination, Class Representatives and members of the Sub-Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

218.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT IV**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-5(f),** *et seq.*
**Retaliation**
**(On Behalf of Plaintiffs Smith, Bross, Shursky and Whitmer)**

219.   Plaintiffs Smith, Bross, Shursky and Whitmer re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

220.   Plaintiffs engaged in protected activities by complaining about gender discrimination—including but not limited to pay disparity, denial of promotions, low rankings and tiers, denial of opportunities for professional advancement, favorable treatment towards male

employees and derogatory remarks—to people in management positions and in Human Resources.

221.    Defendant engaged in adverse employment actions against Plaintiffs for engaging in protected activities.  Such adverse employment actions have been in the form of subjecting her to unfavorable terms and conditions of employment, including inter alia, denials of promotions, disciplinary actions and subjection to a hostile working environment.  The adverse employment actions have materially and adversely affected Plaintiffs' overall terms and conditions of employment.

222.    A reasonable employee would find Merck's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

223.    Defendant's retaliatory acts against Plaintiffs were a direct and proximate result of her protected activities.

224.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Plaintiffs, entitling them to punitive damages.

225.    As a result of Defendant's conduct alleged in this complaint, Plaintiffs Smith, Bross, Shursky and Whitmer have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

226.    By reason of Defendant's discrimination, Plaintiffs are entitled to all legal and equitable remedies available, including an award of punitive damages.

227.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT V**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-5(f), *et seq.*, AS AMENDED**
**CONSTRUCTIVE DISCHARGE**
**(On behalf of Plaintiffs Smith, and Whitmer)**

228.    Plaintiffs Smith, and Whitmer re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

229.    Defendant constructively discharged the employment of Plaintiffs Smith, and Whitmer due to gender and pregnancy discrimination and in retaliation for raising complaints. Defendant's constructive discharge of Plaintiffs Smith, and Whitmer were adverse employment actions that materially and adversely changed the overall terms and conditions of their employment in violation of Title VII.

230.    Defendant intentionally created an intolerable work atmosphere that forced Plaintiffs Smith, and Whitmer to end their employment, and working conditions were so difficult and unpleasant that reasonable people in their positions would have felt compelled to resign.

231.    Defendant's constructive discharge of Plaintiffs Smith, and Whitmer were direct, proximate and pretextual results of gender discrimination.

232.    A reasonable employee would find Defendant's constructive discharge of Plaintiffs Smith, and Whitmer materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

233.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard to the rights of Plaintiffs Smith, and Whitmer, entitling them to punitive damages.

234.    Defendant's constructive discharge of Plaintiffs Smith, and Whitmer have caused them to suffer harm, including without limitation lost earnings, lost benefits and other severe

financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

235.    Plaintiffs Smith, and Whitmer are therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

236.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT VI**
**VIOLATION OF FAMILY AND MEDICAL LEAVE ACT ("FMLA")**
**29 U.S.C. § 2601, *et seq.***
**(On Behalf of Plaintiffs Smith, Bross, Mountis, Shursky and Whitmer and all Class Members)**

237.    Class Representatives Smith, Bross, Mountis, Shursky and Whitmer re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.   This Count is brought on behalf of Class Representatives and all Class members.

238.    Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of FMLA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions.   Plaintiffs took approved FMLA leave for maternity leave.

239.    Merck interfered with the taking of protected maternity leave by Class Representatives and Class members and discriminated against them for the taking of such leave, in violation of the FMLA.

240.    Merck interfered with the taking of protected maternity leave by Class Representatives and Class members and discriminated against them for taking such leave by using the taking of FMLA leave as a negative factor in employment actions, including, inter alia,

57

demoting her, denying her career-advancement opportunities, making inaccurate statements harmful to her professional career, and creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave.

241.   Defendant acted willfully, intentionally and with reckless disregard for Class Representatives' rights under the FMLA.

242.   As a direct and proximate result of Defendant's actions, Class Representatives suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses and costs and is entitled to all legal and equitable remedies available.

243.   By reason of Defendant's discrimination, Class Representatives and Class members are entitled to all legal and equitable remedies available for violations of the FMLA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 2617.

## COUNT VII
## VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963 ("EQUAL PAY ACT"), 29 U.S.C. §206(d)
### (On Behalf of Plaintiffs Smith, Bross, Mountis, Whitmer, and EPA Collective Action Plaintiffs)

244.   Plaintiffs Smith, Bross Mountis, and Whitmer re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

245.   This Count is brought on behalf of the Class Representatives and all EPA Collective Action Class, including all EPA Collective Action Plaintiffs who "opt in" to this action.

246.    Defendant has discriminated against the Class Representatives and all EPA Collective Action Plaintiffs within the meaning of the Equal Pay Act, ("EPA") by providing them with lower pay than similarly situated male colleagues on the basis of their gender, female, even though the Class Representatives and all others similarly situated performed similar duties requiring the same skill, effort and responsibility of male counterparts.

247.    The Class Representatives, all EPA Collective Action Plaintiffs, and similarly situated males all perform similar job duties and functions across all Merck offices.  The Class Representatives, all EPA Collective Action Plaintiffs, and similarly situated male employees all performed jobs which required equal skill, effort and responsibility, and are or were performed under similar working conditions.

248.    Defendant so discriminated against the Class Representatives and all EPA Collective Action Plaintiffs by subjecting them to discriminatory pay, discriminatory denials of bonuses and other compensation incentives, discriminatory denial of promotions and other forms of discrimination in violation of the Equal Pay Act.

249.    The differential in pay between males and female employees was not due to seniority, merit, quantity or quality of production, but was due to gender.

250.    Defendant caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on gender, in violation of the EPA.

251.    The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).  Because Defendant has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

252.    As a result of Defendant's conduct alleged in this complaint, the Class Representatives and all EPA Collective Action Plaintiffs have suffered and continue to suffer

harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

253.    By reason of Defendant's discrimination, the Class Representatives and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

254.    Attorneys' fees should be awarded under 29 U.S.C. §216(b).

**COUNT VIII**
**VIOLATION OF THE LAW AGAINST DISCRIMINATION,**
**N.J. STAT. § 10:5-1, *et seq*.**
**Pay Discrimination**
**(On Behalf of Plaintiffs Smith, Bross, Shursky and New Jersey-based Class Members)**

255.    Class Representatives Smith, Bross, and Shursky re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

256.    This Count is brought on behalf of Class Representatives Smith, Bross, Shursky and all New Jersey-based members of the Class.

257.    Defendant has discriminated against Class Representatives and all members of the Class in violation of the New Jersey State Law Against Discrimination by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendant's wrongful conduct and its policies, practices and procedures.

258.    Defendant has discriminated against Class Representatives and all members of the Class by subjecting them to discriminatory denials of pay raises and discriminatory performance evaluations, tiers, and rankings that affect pay, in violation of the Law Against Discrimination.

259.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Class Representatives and the members of the proposed class, entitling Class Representatives and the members of the Class to punitive damages.

260.    As a result of Defendant's conduct alleged in this complaint, Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

261.    By reason of Defendant's discrimination, Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of the Law Against Discrimination, including an award of punitive damages.

262.    Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

**COUNT IX**
**VIOLATION OF THE LAW AGAINST DISCRIMINATION**,
**N.J. STAT. § 10:5-1, *et seq*.**
**Promotion Discrimination**
**(On Behalf of Plaintiffs Smith, Bross and Shursky and New Jersey-based Class Members)**

263.    Class Representatives Smith, Bross and Shursky re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

264.    This Count is brought on behalf of Class Representatives Smith, Bross and Shursky and all New Jersey-based members of the Class.

265.    Defendant has discriminated against Class Representatives and all members of the Class in violation of the Law Against Discrimination by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and

disparately treated as a result of Defendant's wrongful conduct and its policies, practices and procedures.

266.    Defendant has discriminated against Class Representatives and all members of the Class by treating them differently from and less preferably than similarly situated male employees, and by subjecting them to discriminatory denials of promotions, discriminatory denials of developmental opportunities and discriminatory performance evaluations that affect promotions in violation of the Law Against Discrimination.

267.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Class Representatives and the members of the proposed Class, entitling Class Representatives and the members of the Class to punitive damages.

268.    As a result of Defendant's conduct alleged in this complaint, Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

269.    By reason of Defendant's discrimination, Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of the Law Against Discrimination, including an award of punitive damages.

270.    Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

**COUNT X**
**VIOLATION OF THE LAW AGAINST DISCRIMINATION,**
**N.J. STAT. § 10:5-1, *et seq*.**
**Pregnancy and Sex Plus Discrimination**
**(On Behalf of Plaintiffs Smith, Bross and Shursky and New Jersey-based Sub-Class**
**Members)**

271.    Class Representatives Smith, Bross and Shursky re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

272.    This Count is brought on behalf of the Class Representatives Smith, Bross, Shursky and all New Jersey members of the Sub-Class.

273.    Defendant has discriminated against Class Representatives and all members of the Sub-Class in violation of New Jersey Law Against Discrimination Title VII by subjecting them to different treatment on the basis of their gender.  The members of the Sub-Class have been disparately impacted and disparately treated as a result of Defendant's wrongful conduct and its policies, practices and procedures.

274.    Defendant has discriminated against the Sub-Class members bringing this claim by treating them differently from and less preferably than similarly situated male employees and non-pregnant employees and by subjecting them differential and substandard terms and conditions of employment including but not limited to discriminatory denials of fair compensation, discriminatory denials of promotional and discriminatory treatment with respect to work responsibilities and other terms and conditions of employment in violation of New Jersey Law Against Discrimination.

275.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Class Representatives and the members of the

proposed Sub-Class, entitling Class Representatives and the members of the Sub-Class to punitive damages.

276.    As a result of Defendant's conduct alleged in this complaint, Class Representatives and the members of the Sub-Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

277.    By reason of Defendant's discrimination, Class Representatives  and members of the Sub-Class are entitled to all legal and equitable remedies available for violations of New Jersey Law Against Discrimination, including an award of punitive damages.

278.    Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

**COUNT XI**
**VIOLATION OF THE FAMILY LEAVE ACT**
**N.J. STAT. § 34:11B-1,** *et. seq.*
**(On Behalf of Plaintiffs Smith, Bross, Shursky and New Jersey-Based Sub-Class Members)**

279.    Class Representatives Smith, Bross and Shursky re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

280.    Defendant discriminated against Class Representatives Smith, Bross, Shursky and New Jersey-based members of the Sub-Class on the basis of their pregnancy, childbirth and related conditions in violation of the Family Leave Act ("FLA").  N.J. Stat. § 34:11B-1, et seq.

281.    Defendant retaliated against Class Representatives Smith, Bross, Shursky and New Jersey-based members of the Sub-Class for taking FLA-protected leave by adversely and materially changing the terms and conditions of their employment by, inter alia, demoting them, denying their career-advancement opportunities, and otherwise creating an environment hostile to pregnancy and the taking of statutorily protected leave.

282.     Defendant acted willfully, intentionally, and with reckless disregard for the FLA rights of Class Representatives and New Jersey-based members of the Sub-Class.

283.     As a direct and proximate result of defendant's actions, Class Representatives Smith, Bross, Shursky and New Jersey-based members of the Sub-Class suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, pain and suffering, expenses and costs, and is entitled to all legal and equitable remedies available.

284.     By reason of Defendant's discrimination, Class Representatives Smith, Bross, Shursky and New Jersey-based members of the Sub-Class are entitled to all legal and equitable remedies available for violations of the FLA, including an award of punitive damages.

285.     Attorneys' fees should be awarded under N.J. Stat. § 34:11B-1.

**COUNT XII**
**VIOLATIONS OF THE LAW AGAINST DISCRIMINATION,**
**N.J. STAT. § 10:5-12(d)** *et seq.***,**
**Retaliation**
**(On Behalf of Plaintiffs Smith, Bross and Shursky)**

286.     Class Representatives Smith, Bross and Shursky re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

287.     Class Representatives Smith, Bross and Shursky engaged in a protected activity by complaining about gender discrimination—including but not limited to pay disparity, denial of opportunities for professional advancement, favorable treatment towards male employees and derogatory remarks—to people in management positions and in Human Resources.

288.     Defendant engaged in adverse employment actions against Class Representatives Smith, Bross and Shursky for engaging in protected activities.  Such adverse employment actions have been in the form of subjecting them to unfavorable terms and conditions of employment,

including inter alia, denials of promotions, disciplinary actions and subjection to a hostile working environment.  The adverse employment actions have materially and adversely affected Class Representatives Smith, Bross and Shursky' overall terms and conditions of employment.

289.   A reasonable employee would find Merck's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

290.   Defendant's retaliatory acts against Class Representatives Smith, Bross and Shursky were a direct and proximate result of her protected activities.

291.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives Smith, Bross and Shursky entitling them to punitive damages.

292.   As a result of Defendant's conduct alleged in this complaint, Class Representatives Smith, Bross and Shursky have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

293.   By reason of Defendant's discrimination, Class Representatives Smith, Bross and Shursky are entitled to all legal and equitable remedies available for violations of the Law Against Discrimination, including an award of punitive damages.

294.   Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

## PRAYER FOR RELIEF ON CLASS CLAIMS

WHEREFORE, the Class Representatives, on their own behalf and on behalf of the Class, pray that this Court:

A.     Grant certification of this case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a), (b)(2) and/or (b)(3), on behalf of the proposed Plaintiff Class;

designation of the proposed Class Representatives as representative of this Class; and designation of Plaintiff's counsel of record as Class Counsel;

B.      Declare and adjudge that the corporate Defendant's employment policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Class Representatives and Class members;

C.      A permanent injunction against Merck and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages and gender discrimination as set forth herein;

D.      Order Defendant to initiate and implement programs that will: (i) provide equal employment opportunities for female employees; (ii) remedy the effects of the Defendant's past and present unlawful employment policies, practices and/or procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above; and/or

E.      Order Defendant to initiate and implement systems of assigning, training, transferring, compensating and promoting female employees in a non-discriminatory manner; and/or

F.      Order Defendant to establish a task force on equality and fairness to determine the effectiveness of the programs described in D through E above, which would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in D through E above; and/or

G.     Order Defendant to adjust the wage rates and benefits for the Class Representatives and the Class members to the level that they would be enjoying but for the Defendant's discriminatory policies, practices and/or procedures; and/or

H.     Order Defendant to place or restore the Class Representatives and the Class members into those jobs they would now be occupying but for Defendant's discriminatory policies, practices and/or procedures; and/or

I.     Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that the Defendant have remedied the practices complained of herein and are determined to be in full compliance with the law; and/or

J.     Award nominal, compensatory and punitive damages to the Class Representatives and the Class members, in excess of two hundred and fifty million dollars; and/or

K.     Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to the Class Representatives and Class members; and/or

L.     Award back pay, front pay, lost benefits, preferential rights to jobs, and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by the Class Representatives and the Class members to be determined at trial; and/or

M.     Order Defendant to make whole the Class Representative and Class members by providing them with appropriate lost earnings and benefits, and other affirmative relief; and/or

N.     Award any other appropriate equitable relief to the Class Representatives and Class members; and/or

O.     Award any additional and further relief as this Court may deem just and proper.

## VIII.  <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues triable of right by jury.

Dated:  January 16, 2014               **SANFORD HEISLER, LLP**

                      By:    <u>s/Jennifer Siegel</u>

                           David Sanford (D.C. Bar No. 457933)

                           Kate Mueting (D.C. Bar No. 988177)

                           **SANFORD HEISLER, LLP**

                           1666 Connecticut Avenue, N.W., Suite 300

                           Washington, D.C. 20009

                           Telephone: (202) 499-5201

                           Facsimile:  (202) 499-5119

                           dsanford@sanfordheisler.com

                           kmueting@sanfordheisler.com

                           Jennifer Siegel (NJ-6110)

                           Deborah Marcuse (NY Bar No. 457933)

                           **SANFORD HEISLER, LLP**

                           1350 Avenue of the Americas, 31st Floor

                           New York, New York 10019

                           Telephone: (646) 402-5656

                           Facsimile: (646) 402-5650

                           jsiegel@sanfordheisler.com

                           dmarcuse@sanfordheisler.com

                         *Attorneys for Plaintiffs Kelli Smith, Kandice Bross, Rachel Mountis, Amy Shursky and Kate Whitmer*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Plaintiffs' Amended Class Action Complaint was served via electronic means on the following counsel of record:

**Michael S. Burkhardt, Esq. (mburkhardt@morganlewis.com)**
**Blair J. Robinson, Esq. (blair.robinson@morganlewis.com)**
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103-2921
*Counsel for Defendant*

I hereby certify that a true and correct courtesy copy was served via U.S. Mail to:

**The Honorable Joel A. Pisano**
United States District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Room 2020
Trenton, NJ 08608

Respectfully submitted this 16th day of January, 2014.

By:  _____s/_____
Jennifer Siegel
**SANFORD HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402-5660
Facsimile: (646) 402-5651

*Counsel for Plaintiffs*

70