NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KELLI SMITH, individually and on behalf of a class of similarly situated female employees,<br><br>Plaintiffs,<br><br>v.<br><br>MERCK & CO., INC.,<br><br>Defendant. | Civil Action No. 13-2970 (MAS) (LHG)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on two motions by Plaintiffs Kelli Smith, Kandice Bross, Rachel Mountis, and Kate Whitmer, on behalf of themselves and all others similarly situated ("Plaintiffs"). First, Plaintiffs move for the conditional certification of an Equal Pay Act ("EPA") collective action pursuant to 29 U.S.C. § 216(b). (ECF Nos. 78, 80.) Plaintiffs additionally move for the entering of a corrective notice to prospective class members and collective action members and the tolling of the statute of limitations for potential collective action members' EPA claims. (ECF No. 79.) Defendant Merck & Co., Inc. ("Defendant") opposed both motions (ECF Nos. 94, 95), and Plaintiffs replied (ECF Nos. 99, 100.) Defendant filed motions for leave to file sur-replies with respect to both of Plaintiffs' motions (ECF Nos. 101, 102), and Plaintiffs opposed Defendant's motions (ECF No. 103).[1] The Court has carefully considered the parties' submissions

---

[1] Per Local Civil Rule 7.1(d)(6), sur-replies are not permitted unless leave is granted by the Judge to whom the case is assigned. Defendant seeks to file sur-replies based on Plaintiffs' alleged mischaracterizations of Defendant's opposition briefs and the applicable law. As the record and prior submissions in this matter are sufficient for the Court to decide the motions, and the Court is

and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons stated below, Plaintiffs' motion for conditional certification is granted, and Plaintiffs' motion for miscellaneous relief is granted in part and denied in part.

I. **Background**

Plaintiffs' Amended Complaint, filed on January 16, 2014, and brought by five[2] named plaintiffs individually and on behalf of a class of similarly situated female employees, consists of twelve causes of action against Defendant for: (1) pay discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e; (2) promotion discrimination in violation of Title VII; (3) pregnancy and sex plus discrimination in violation of Title VII; (4) retaliation in violation of Title VII; (5) constructive discharge in violation of Title VII; (6) violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601; (7) violation of the Fair Labor Standards Act of 1938 ("FLSA"), as amended by the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d); (8) pay discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1; (9) promotion discrimination in violation of NJLAD; (10) pregnancy and sex plus discrimination in violation of NJLAD; (11) violation of the New Jersey Family Leave Act, N.J.S.A. 34:11B-1; and (12) retaliation in violation of NJLAD. (ECF No. 22.) As Plaintiffs' motions sub judice relate only to their claim that Defendant violated the EPA, the Court will discuss only the allegations and facts relevant to that claim.

---

capable of making its own determination as to sufficiency of the parties' arguments and the applicable law, Defendant's sur-replies are not necessary to decide the motions. Further, to the extent Defendant's sur-replies address arguments Plaintiffs raised for the first time in their reply brief, the Court declines to reach those additional arguments. *See infra* n.5. Thus, the Court denies Defendant's motions for leave to file sur-replies.

[2] Plaintiff Amy Shursky voluntarily dismissed her claims against Defendant. (ECF No. 39.)

In their Amended Complaint, Plaintiffs allege that Defendant, "a global pharmaceutical powerhouse," has "systemically paid female sales employees less than similarly situated male sales employees who performed the same job duties and worked under the same conditions." (Am. Compl. ¶¶ 1, 4, ECF No. 22.) Specifically, Plaintiffs allege that, in 2011, Defendant underwent a company-wide reorganization, and, as early as March 2011, compensation for sales representatives was based on a new three tier system: S1, S2, and S3 (with S1 being the lowest tier with the lowest salary range). (*Id.* ¶ 9.) Additionally, Plaintiffs allege that Defendant does not publish the criteria used to assign employees to the different tiers and Defendant's senior management "systematically assigns female sales representatives . . . to lower tiers than male sales representatives with the same job duties and qualifications, irrespective of whether the overall sales numbers and performance of the sales representatives warrants such low tier assignments." (*Id.*) Furthermore, Plaintiffs assert that "Customer Team Leaders," the direct supervisors of sales representatives, do not have the authority to make tangible employment decisions and "are simply reading from pre-approved 'scripts' from senior management when they communicate employment-related decisions." (*Id.* ¶ 10.)

In the declarations submitted by named plaintiffs, Plaintiffs further explain that sales representatives were divided into "M" levels until the company-wide reorganization in 2011, then Defendant switched to the "S" system. (Mot. to Substitute Exs., Ex. B ("Smith Decl.") ¶ 8, ECF No. 80-2[3].) Plaintiffs further assert that the only meaningful distinction between the S1 and S2 level is the compensation, with S2 salaries typically being higher and having higher bonus targets which allows them to be eligible for greater incentive pay. (*Id.* ¶ 10.) Plaintiffs additionally attest

---

[3] Plaintiffs moved to substitute Ms. Smith's declaration that had previously been submitted to the Court without a signature page. (ECF No. 80.) The Magistrate Judge granted the motion. (ECF No. 85.)

3

that Defendant had a centralized compensation system and that individual supervisors did not have discretion over sales representatives' pay or their placement in the "S" system. (*Id.* ¶¶ 13-15.)

With respect to named plaintiff Kelli Smith ("Ms. Smith"), she began working for Defendant in 2004, and in March 2011, after she returned from maternity leave, she was demoted during the company-wide reorganization. (Am. Compl. ¶ 39; Smith Decl. ¶¶ 5, 17.) Before the reorganization, Ms. Smith alleges that she ranked in the third-highest of six ranking categories. (Am. Compl. ¶39.) However, after returning from maternity leave, and Defendant's implementation of the three-tier system, she was placed at the lowest tier, S1. (*Id.*) Additionally, Ms. Smith asserts that she remained at the S1 level despite exceptional performance and requests for promotion, while a male sales representative who was not more experienced or qualified advanced to the S2 level and received a considerable increase in pay. (*Id.* ¶ 40; Smith Decl. ¶ 20.) Ms. Smith asserts that she was told by the Director of Commercial Operations John Daly and Customer Team Leader Ed Veltre that Defendant's decision to assign her to the S1 level was made because she had been pregnant and had taken leave. (Am. Compl. ¶ 42; Smith Decl. ¶ 18; Decl. of Deborah Marcuse ("Marcuse Decl."), Ex. 18 ("Smith Dep. Tr.") 279:21-280:5, ECF No. 78-14.)

With respect to named plaintiff Kandice Bross ("Ms. Bross"), she began working for Defendant in January 2010 when it merged with Schering-Plough. (Am. Compl. ¶ 59; Marcuse Decl., Ex. 2 ("Bross Decl.") ¶ 5, ECF No. 78-4.) Ms. Bross asserts that during her initial hire Defendant assigned her to a lower position with lower compensation at a lower tier than equally qualified male employees with the same job duties. (Am. Compl. ¶ 63; Bross Decl. ¶ 21.) Additionally, Ms. Bross states that in September 2010, Customer Team Leader Michael Flaherty admitted that her salary "stuck out like a sore thumb" relative to the salaries of others in her region.

(Am. Compl. ¶ 63; Bross Decl. ¶ 22.) Even after two salary increases, Ms. Bross asserts that her salary was significantly lower than the rest of her team. (Am. Compl. ¶ 64; Bross Decl. ¶ 23.) During the company-wide reorganization in March 2011, Ms. Bross was assigned to the lowest job tier, S1, even though male employees with lower sales numbers were assigned to the better-compensated S2 tier. (Am. Compl. ¶ 68; Bross Decl. ¶ 26.) In 2012, following her maternity leave, Ms. Bross states that she was denied elevation to the S2 tier based on Defendant's policies and procedures and that she received a lower review because it had been a "VERY busy year for [her] and [her] family." (Am. Compl. ¶¶ 70-71; Bross Decl. ¶¶ 28-29.)

With respect to named plaintiff Rachel Mountis ("Ms. Mountis"), she began working for Merck in March 2005, and in December 2010, one week after going out on short-term disability due to a pregnancy-related health problem, Defendant decided to lay her off. (Am. Compl. ¶¶ 82, 86-87; Marcuse Decl., Ex. 3 ("Mountis Decl.") ¶ 5, ECF No. 78-5.) Following an announcement in fall of 2010 that Defendant would be laying off certain representatives, Customer Team Leader John Connelly contacted Ms. Mountis on December 3, 2010, indicated to her that he was reading from a script and informed her that she was laid off. (Am. Compl. ¶¶ 86-87.) Ms. Mountis alleges that Defendant stated that it would determine layoffs based on three factors, and the person who was ultimately assigned to the territory she was laid off from was male, had comparable sales numbers, but had not received the awards she had. (*Id.* ¶ 89.) Ms. Mountis alleges she then contacted her former Customer Team Leader John Connelly who suggested that the decision was made by Defendant's senior leadership. (*Id.* ¶ 87.) Ms. Mountis alleges that she was eventually rehired at a lower position, and in April 2011, during the company-wide reorganization, was assigned to the lowest job tier, S1. (*Id.* ¶¶ 90-91; Mountis Decl. ¶ 19.) Ms. Mountis alleges that while on her second maternity leave, in December 2012, she was demoted by Customer Team

5

Leader Andy Darling ("Darling"), and reading from a pre-approved script Darling informed her that Defendant had reassigned her to a less-prestigious position in a territory significantly farther from her home. (Am. Compl. ¶¶ 91-92.)

With respect to named plaintiff Kate Whitmer ("Ms. Whitmer"), she began working for Defendant in July 2005 and in March 2011, during the reorganization, was placed in the S2 tier. (Am. Compl. ¶¶ 107-08; Marcuse Decl., Ex. 4 ("Whitmer Decl.") ¶¶ 5-6, ECF No. 78-6.) Additionally, Ms. Whitmer states that male employees performed the same job as her, and even certain males in the lower S1 tier were paid higher salaries than her. (Am. Compl. ¶ 111; Whitmer Decl. ¶¶ 19-20.) Furthermore, in 2007 and 2008, Ms. Whitmer asserts that a male employee that performed the same job and with the same performance numbers as her, received bonuses three times as high as the bonuses awarded to her. (Am. Compl. ¶ 112; Whitmer Decl. ¶ 21.) Ms. Whitmer also alleges that Defendant gave her a negative performance review in 2011 because, as her manager explained, she had been on maternity leave. (Am. Compl. ¶ 116.) When Ms. Whitmer pointed out to her manager that she was being punished for taking maternity leave, he allegedly told her that "this is just how it is." (*Id.* ¶ 117.)

II. **Plaintiffs' Motion for Conditional Certification of an Equal Pay Act Collective Action**

Plaintiffs contend that Defendant has a policy or practice of paying female sales representatives less than their male counterparts, and because of such, seeks to have their Equal Pay Act collective action conditionally certified and to have notice issued to the collective. Plaintiffs request that the Court conditionally certify the following collective:

> All women employed in the United States as Merck Sales Representatives in "M" grades M5 through M9 or in "S" grades in grades S1 or S2 for at least one day from June 21, 2009 through the present.

(Proposed Or., Ex. 1, ECF No. 78-21.)

A.  **Legal Standard**

The EPA[4] was added as an amendment to the FLSA, based on "the principle of equal pay for equal work regardless of sex." *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974). The EPA was intended by Congress to be "a broad charter of women's rights in the economic field" and "sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it." *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 265 (3d Cir.), *amended*, (3d Cir. Feb. 13, 1970), *cert. denied*, 90 S. Ct. 1696 (1970).

"Section 16(b) of the FLSA . . . gives employees the right to bring a private cause of action on their own behalf and on behalf of 'other employees similarly situated' for specified violations of the FLSA. A suit brought on behalf of other employees is known as a 'collective action.'" *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1527 (2013) (quoting 29 U.S.C. § 216(b)). A collective action allows individuals who are similarly situated to the named plaintiff to opt in to the collective action by filing a written notice of consent with the Court. *See* § 216(b)[5].

---

[4] "No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." 29 U.S.C. § 206(d)(1).

[5] "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b).

In *Symczyk*, the Third Circuit established a two-step approach to certifying a FLSA collective action:

> In deciding whether a suit brought under § 216(b) may move forward as a collective action, courts typically employ a two-tiered analysis. During the initial phase, the court makes a preliminary determination whether the employees enumerated in the complaint can be provisionally categorized as similarly situated to the named plaintiff. If the plaintiff carries her burden at this threshold stage, the court will "conditionally certify" the collective action for the purposes of notice and pretrial discovery. . . .
>
> After discovery, and with the benefit of "a much thicker record than it had at the notice stage," a court following [the modest factual showing] approach then makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008). "This second stage is less lenient, and the plaintiff bears a heavier burden." *Id.* Should the plaintiff satisfy her burden at this stage, the case may proceed to trial as a collective action.

*Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 192-93 (3d Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1523 (2013).

At the first stage, a plaintiff must make a "modest factual showing" for conditional certification to be granted. *Id.* at 193. The Third Circuit has found this showing to require that "a plaintiff must produce some evidence, 'beyond pure speculation,' of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Id.* (quoting *Smith v. Sovereign Bancorp, Inc.*, No. 03-2420, 2003 WL 22701017, at *3 (E.D. Pa. Nov. 13, 2003)). Furthermore, the Third Circuit has approvingly cited the Second Circuit's decision in *Myers*: "The Second Circuit has described this initial step as 'determin[ing] *whether* 'similarly situated' plaintiffs do in fact exist,' while at the second stage, the District Court determines 'whether the plaintiffs who have opted in are in fact 'similarly

situated' to the named plaintiffs.'" *Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 536, n.4 (3d Cir. 2012) (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010)).

**B.     Analysis**

Plaintiffs allege that Defendant had a general policy or practice of paying women less than their male counterparts and that Defendant had common compensation policies and practices that resulted in gender-based pay disparities. Plaintiffs argue that the female sales representatives are similarly situated because they all were performing the same essential work and were subject to the same compensation policies and practices, including the "MSD Compensation Policy." Specifically, Plaintiffs argue that Defendant's compensation policies and practices did not "leav[e] managers to their own devices," but instead gave "step-by-step instructions" and required successive levels of management to review and adjust compensation decisions—with ultimate control in the "Executive Committee" and "Global HR." (Pls.' Conditional Certification Moving Br. 8-9, ECF No. 78-1 (citing Marcuse Decl., Exs. 13-16, 25).) In support of their motion, Plaintiffs submit job descriptions, employment and compensation documents of Defendant, sample pay data, an expert report, and declarations and deposition excerpts of named plaintiffs. (Marcuse Decl., Exs. 1-22, ECF Nos. 78-3 -18.)

The information submitted by Plaintiffs shows that the sales representatives had similar responsibilities; that named plaintiffs were paid less than some allegedly similarly situated males; and that compensation decisions, although based in part on input from some direct managers, were finalized by a central, common office. Additionally, Plaintiffs submitted an expert report regarding compensation differences between male and female sales representatives working for Defendant. (Marcuse Decl., Ex. 5 ("Expert Report"), ECF No. 78-8.) The report found that, on

average, between 2011 and 2015, female sales representatives in the S1 and S2 tiers earned 1.4% less per year than male sales representatives in those tiers.

In opposition, Defendant argues that Plaintiffs have not met their burden for conditional certification and that the evidence Plaintiffs submitted instead demonstrates that Plaintiffs cannot sustain their burden. (Def.'s Conditional Certification Opp'n Br. 2, ECF No. 94.) Primarily, Defendant argues that Plaintiffs cannot show that there is a common unlawful policy or plan connecting the alleged EPA claims of female sales representatives nationwide. (*Id.* at 8-26.) Defendant bases its argument on named plaintiffs' deposition testimony in which each identifies a Customer Team Leader that she believes had a part in her discriminatory pay difference. (*Id.* at 9-16.) In accordance with this deposition testimony, Defendant argues that decisions made by different managers, at different times, in different places cannot support a showing of a common policy. (*Id.*) Additionally, Defendant argues that named plaintiffs' allegedly contradictory declarations attesting that there is a common policy cannot negate their deposition testimony. (*Id.* at 17-21.)

Here, the Court concludes that Plaintiffs have met their burden by making a modest factual showing that a nexus exists between the manner in which Defendant's alleged policy affected them and the manner in which it affected other employees. Plaintiffs have submitted sufficient information at this stage to show that the sales representatives were performing similar responsibilities. Additionally, although the deposition excerpts submitted of the named plaintiffs do demonstrate that some believe that their direct manager may have discriminated against them, none of the named plaintiffs testified that they believed that their direct manager could, or did, unilaterally make compensation determinations. The Court also finds Defendant's argument, that Plaintiffs are not similarly situated because their EPA claim is based primarily on individual

managers' decisions rather than on a central policy, to be premature. *See, e.g., Moore v. Publicis Groupe, S.A.*, No. 11-1279, 2012 WL 2574742, at *10-11 (S.D.N.Y. June 29, 2012) (conditionally certifying an EPA collective action when, among other evidence, the plaintiffs submitted evidence that members of the purported class were subject to the same compensation policies); *Kassman v. KPMG LLP*, No. 11-03743, 2014 WL 3298884, at *6 (S.D.N.Y. July 8, 2014) (holding, in determining whether to conditionally certify an EPA collective action, that the plaintiff has made a "modest factual showing" warranting conditional certification based, in part, on "documentary evidence of [the defendant's] firm-wide compensation policies. . . ."); *Earl v. Norfolk State Univ.*, No. 13-148, 2014 WL 6608769, at *6 (E.D. Va. Nov. 18, 2014) (finding that allegations of a common compensation policy that discriminates against male faculty were sufficient to meet the "modest factual showing" because similarly situated employees might also have EPA claims predicated on the same compensation policy); *Campeau v. NeuroScience, Inc.*, 86 F. Supp. 3d 912, 917 (W.D. Wis. 2015) (holding sufficient for conditional certification allegations that defendant has a "small, centralized group of decision makers who had final approval of pay decisions and whose actions resulted in unequal compensation based on gender."); *see also Kassmam*, 2014 WL 3298884, at *8 (finding that "Defendant's arguments are more suited to a later, more demanding stage of the proceedings, such as a motion to decertify or for summary judgment"). Therefore, Plaintiffs' motion for conditional certification is granted.

C. **Notice**

Plaintiffs further request that the Court authorize opt-in notice to be sent to all potential members of this EPA action. Although nothing in the FLSA or EPA specifically authorizes district courts to order notice to potential opt-in plaintiffs, "by monitoring preparation and distribution of the notice, a court can ensure that the notice is timely, accurate, and informative, and can settle

disputes about the notice's content before it is distributed." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 166 (1989). Accordingly, the parties shall submit a joint proposed notice to the Court for approval by May 27, 2016. If the parties cannot agree on language, they should explain any disputes and propose alternative language.

### III. <u>Plaintiffs' Motion for Miscellaneous Relief</u>

Plaintiffs, additionally, move for an order issuing a corrective notice to prospective class members and collective action members, and tolling the statute of limitations for potential collective action members' EPA claims. (ECF No. 79.)

#### A. Corrective Notice

Plaintiffs first move for a corrective notice "because [Defendant] has promulgated an official policy that inhibits employees from communicating with attorneys, coworkers, and government authorities." (Pl.'s Misc. Moving Br. 1-2, ECF No. 79-1.) Plaintiffs argue that Defendant's Policy Letter No. 17 (the "Policy") is unlawful on its face and deters other sales representatives from providing relevant information, joining the litigation, or communicating with co-workers about possible discrimination claims. (*Id.* at 2.) Specifically, Plaintiffs argue that Defendant's Policy imposes an expectation that employees will notify Defendant prior to communicating with or cooperating with government agencies, such as the EEOC, or prior to signing any statement or affidavit. (*Id.* 3-6.) Through their declarations, named plaintiffs state that they believed they were in violation of the Policy when they contacted counsel and filed suit, and other employees, likewise, may believe that they may not speak with outside counsel without first notifying Defendant under the Policy. (Decl. of Deborah Marcuse ("Marcuse Decl. II"), Exs. 2-4, ECF Nos. 79-4 -6.) Based on these beliefs, Plaintiffs argue that a corrective notice is needed because the Policy has likely chilled participation in this lawsuit.

In opposition, Defendant argues that, on its face, the Policy "relates only to government investigations and litigation involving Merck products." (Def.'s Misc. Opp'n Br. 5, ECF No. 95.) Defendant argues that the Policy has been in effect, in some form, since 2003, and does not threaten the "proper functioning of this litigation." (*Id.* at 5-6, n.3.) Further, Defendant argues that Plaintiffs have failed to meet the legal standard to establish that corrective notice is warranted. (*Id.* at 9-11 (citing *Gulf Oil, Co. v. Bernard*, 452 U.S. 89 (1981).)

The Policy, dated September 7, 2012, is titled, "Contact with Law Enforcement Agencies, Government Inspectors, and Other Third Parties." (Marcuse Decl. II, Ex. 1 ("Policy") 1, ECF No. 79-3.) Under the heading "Purpose and Scope," the Policy states that its intent is "to assist Field Based Employees in handling situations involving government inspections and investigations, to describe generally the inspection authority of the Food and Drug Administration (FDA) and other regulatory agencies, and to provide guidance for handling situations that may have legal implications for Merck." (*Id.* ¶ 1.) Additionally, under the heading "General Statement of Policy," it states that:

> Field Based Employees may encounter a variety of situations involving law enforcement or other government inspectors or investigators. These may include personnel from the FDA, Drug Enforcement Administration (DEA), the Federal Bureau of Investigation (FBI), the Office of Inspector General of the Department of Health and Human Services (OIG), state officials, or others.

(*Id.* ¶ 2.) The Policy goes on to explain the inspection powers for the Food and Drug Administration, Drug Enforcement Administration, and State Pharmacy Boards. (*Id.*) The Policy also discusses what to do, and employees' rights, if a government investigator approaches them to conduct a search or take their interview. (*Id.* ¶ 3.) The Policy also discusses signing affidavits and other statements from investigators (*id.* ¶ 4), and receiving legal documents on behalf of Defendant

(*id.* ¶ 5). Lastly, the Policy addresses notifying Defendant of potential claims that an employee becomes aware of through inspectors, patients, or otherwise, and what to do in the event the employee is contacted by the media, private attorneys, or market research firms. (*Id.* ¶¶ 6-7.)

The Court agrees with Defendant that, on its face, the Policy is only informing employees of what to do when contacted by government officials, and other third parties, in relation to investigation of Defendant's pharmaceutical products. Additionally, the Policy was in place long before this action was filed and was not made by Defendant to its employees in response to this action. Moreover, the case law on which Plaintiffs rely is not in line with the facts of this case, and the named plaintiffs' declarations state nothing more than that they believe other employees may have been or may be in the future dissuaded from talking with outside counsel regarding this action. Here, the Court does not find that there has been any form of abusive communication that threatens the proper functioning of this litigation. *See Gulf Oil*, 452 U.S. at 100. Accordingly, the Court denies Plaintiffs' request for an order issuing a corrective notice.

### B. Equitable Tolling

Plaintiffs also seek equitable tolling of the statute of limitations for potential opt-in members' EPA claims. Plaintiffs seek tolling from the "cessation of the parties' first tolling agreement through the end of the § 216(b) notice and opt-in period."[6] (Pl.'s Misc. Moving Br.

---

[6] In Plaintiffs' reply brief, however, Plaintiffs additionally seek "legal tolling" from June 2012 through May 24, 2013, the period during the parties' first tolling agreement. (Pl.'s Misc. Reply Br. 11, ECF No. 99.) Plaintiffs only make cursory mention of this period in a footnote in their moving brief, however, provide no legal argument until their reply brief as to why "legal tolling" should extend to their EPA claim, as such claim was not asserted during the parties' first tolling agreement. (*See* Pls.' Misc. Moving Br. 23, n.9.) As this argument was adequately raised for the first time only on reply, the Court declines to consider it. *See Tigert v. Ranbaxy Pharm., Inc.*, No. 12-154, 2012 WL 6595806, at *5 (D.N.J. Dec. 18, 2012) (*citing United States v. Boggi*, 74 F.3d 470, 478 (3d Cir. 1996) (declining to consider arguments raised in a reply brief). Additionally, even if the Court were to consider the argument, the Court agrees with the Southern District of

22.) Specifically, Plaintiffs seek the tolling of two periods: (1) June 27, 2015, through the date of Plaintiffs' motion for conditional certification, because of discovery disputes and other delays that postponed the filing of the motion; and (2) during the pendency of Plaintiffs' conditional certification motion, including any disputes over the notice and the notice and opt-in period.[7] (Id. at 23.)

Here, on January 16, 2014, Plaintiffs filed their Amended Complaint. (ECF No. 22.) On April 14, 2014, the parties entered into a tolling agreement[8] that expressly tolled the EPA claims of any potential opt-in plaintiffs. (Decl. of Michael S. Burkhardt ("Burkhardt Decl.") ¶¶ 6-7, Ex. 3, ECF No. 95-4.) Defendant terminated the agreement effective June 27, 2015. (Burkhardt Decl. ¶¶ 9-10, Ex. 4, ECF No. 95-5.) On September 11, 2015, Plaintiffs filed their motion for conditional certification, which was returnable on November 16, 2015. (ECF No. 78.)

As to the first argument, Plaintiffs state that discovery delays and disputes following Defendant's termination of the tolling agreement warrant tolling. (Pls.' Misc. Moving Br. 33.) Specifically, Plaintiffs argue that Defendant did not produce contact information for class members until July 16, 2015, and discovery disputes continued between the parties through August 2015 regarding Defendant's class-wide pay data production. (Id. at 33-36.) Plaintiffs argue that these facts closely resemble the facts in Barghout v. Bayer Healthcare Pharms., No, 11-1576 (D.N.J.

---

New York's recent decision in Barrett v. Forest Labs., Inc., No. 12-5224, 2015 WL 6437494, at *2 (S.D.N.Y. Oct. 5, 2015), rejecting a similar argument based on a similar agreement.

[7] Plaintiffs additionally argue that the entire period from June 2012 until the end of the opt-in period should be tolled due to Defendant's Policy. (Pls.' Misc. Moving Br. 23.) Plaintiffs' argument in this regard is based on the same arguments they made in support of their request for a corrective notice. As the Court has already rejected those arguments, the Court again disagrees with Plaintiffs' arguments and will not grant equitable tolling based on Defendant's Policy.

[8] This is the second tolling agreement the parties entered into, but the only relevant tolling agreement in regards to this decision.

May 31, 2013), where the court granted over two years in equitable tolling in light of procedural delays and discovery disputes. (Pls.' Misc. Moving Br. 32-33.) In opposition, Defendant argues that Plaintiffs have not established "extraordinary" circumstances as any delays were minimal and the discovery sought was of marginal relevance to Plaintiffs' conditional certification motion. (Def.'s Misc. Opp'n Br. 30-34.)

The Third Circuit in *Santos* set forth the applicable analysis to be applied to equitable tolling claims:

> Equitable tolling, if available, can rescue a claim otherwise barred as untimely by a statute of limitations when a plaintiff has "been prevented from filing in a timely manner due to sufficiently inequitable circumstances." *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 240 (3d Cir. 1999). "This occurs (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." *Hedges*, 404 F.3d at 751 (internal citations omitted); *School Dist. v. Marshall*, 657 F.2d 16, 19-20 (3d Cir. 1981) (internal citations omitted).

*Santos ex rel. Beato v. United States*, 559 F.3d 189, 197 (3d Cir. 2009). Furthermore, "[t]he remedy of equitable tolling is extraordinary, and we extend it only sparingly." *Id.* (internal quotation marks omitted).

Here, although Plaintiffs attempt to align this case with *Barghout*, Plaintiffs have not shown this Court why the discovery sought in the approximately three-month period Plaintiffs seek to be tolled was necessary to the filing of their motion for conditional certification. Although the Court agrees that Plaintiffs were entitled to this discovery, this does not necessarily mean that the discovery was needed before the Plaintiffs filed their motion for conditional certification. Additionally, even though the Magistrate Judge extended the time for the filing of Plaintiffs' motion for conditional certification due to the discovery delays in July and August 2015, she did

not prevent Plaintiffs from filing their motion before that deadline. Moreover, Plaintiffs have not shown that the disputes over the approximately three month period should constitute "exceptional" circumstances in this case. As equitable tolling is an extraordinary remedy to be used sparingly, the Court denies Plaintiffs' request to toll the period between June 27, 2015, and September 11, 2015.

As to Plaintiffs' second argument, they seek equitable tolling from the filing of their motion for conditional certification, September 11, 2015, through the end of the opt-in period to account for the inherent delays between filing of the motion, notice being sent, and the time allowed for potential opt-in plaintiffs to respond. (Pls.' Misc. Moving Br. 36-37.) In opposition, Defendant argues that when the delay is attributable to the normal litigation process, equitable tolling is not appropriate or there would be tolling in every EPA collective action case, contravening Congress's express intent of requiring each individual to file written consent to opt-in to the action before his or her claims are tolled. (Def.'s Misc. Opp'n Br. 34-35.)

Here, the Court, considering the high standard for equitable tolling and acknowledging that the Third Circuit has not weighed in on this issue, declines to toll the statute of limitations at this time. This denial, however, is without prejudice to the individual opt-in plaintiffs' right to move before this Court to have the statute of limitations equitably tolled as to their claims.

## IV. Conclusion

For the reasons set forth above, Plaintiffs' motion for conditional certification is granted, and Plaintiffs' motion for miscellaneous relief is granted in part and denied in part. An order consistent with this Memorandum Opinion will be entered.

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: April 27, 2016