<u>**VIA ECF and U.S. Mail**</u>

<u>**May 5, 2017**</u>

The Honorable Lois H. Goodman
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, NJ 08608
lhg_orders@njd.uscourts.gov

Re:     <u>*Smith et al. v. Merck & Co., Inc.*, Case No. 3:13-cv-0297</u>

Dear Judge Goodman:

The parties write in follow up to the telephonic status conference conducted by the Court on April 24, 2017. In anticipation of the May 16 close of fact discovery in the above-captioned matter, the parties have met and conferred regarding several outstanding discovery disputes. However, the parties are unable to reach agreement on three topics: (1) the production of two[1] pay equity studies conducted by Defendants; (2) the production of the names and employee identification numbers of male comparators; and (3) the deposition of Robert McMahon. The parties set forth their respective positions on each issue below, and seek the Court's guidance.

## I.     **The Pay Equity Studies**

### A.     *Plaintiffs' Position*

For more than two years, Merck has withheld at least two pay equity studies based on unfounded claims of attorney-client privilege.[2] During that period, Defendants have engaged in dilatory and obstructionist discovery tactics designed to impede Plaintiffs' access to critical information and documentation, including failing to fully disclose how many studies are being withheld until a deposition last week. The case law, however, is clear: The pay equity studies at issue are not covered by the attorney-client privilege. And, even if they were covered, Defendants have waived any such protection. Plaintiffs therefore request that the Court compel the production of all responsive pay equity studies, or in the alternative, conduct an *in camera* review of the same in order to determine whether the studies should be produced with redactions.

#### 1.     *Relevant Factual & Procedural Background*

Plaintiffs first requested all documents related to any internal or external compensation equity analysis or audit, including documents concerning recommended and actual pay equity adjustments, in a Request for Production of Documents ("RPD") served on March 9, 2015. (Ex.P-1, Plaintiffs' First Set of Requests for Production.) Defendants responded to this Request with boilerplate objections on April 13, 2015, but did not disclose that they were withholding responsive information on the basis of privilege. (Ex. P-2, Defendants' Responses to Plaintiffs' First Set of

---

[1] This number reflects Defendants' (current) representation regarding the number of pay equity studies they are withholding, on which Plaintiffs are forced to rely.

[2] Defendants do not invoke the work product doctrine as a basis to withhold the pay equity studies at issue here, nor could they, as the work product doctrine does not shield the studies from production.

Requests for Production.) Nearly one year later, during the March 23, 2016 Rule 30(b)(6) deposition of Mary Weber, Plaintiffs learned that Defendants were, in fact, withholding at least one internal pay equity analysis completed in 2013 on the putative basis of attorney-client privilege and/or work-product protection.[3] (*See* Ex. P-3, Weber Tr. at 303-14.) Nonetheless, Defendants never supplemented their response to the relevant RPD.

On April 19, 2016, Plaintiffs sent written correspondence to Defendants noting that Defendants' response to Plaintiffs' March 2015 RPD related to pay equity studies and compensation adjustments appeared to be deficient. Plaintiffs also sought Defendants' responses to supplemental interrogatories designed to elicit information surrounding the analyses referred to by Ms. Weber. Defendants ignored Plaintiffs' correspondence, but in their June 10, 2016 responses to Plaintiffs' supplemental interrogatories, Defendants disclosed a single pay equity study conducted in 2013 (hereinafter "the 2013 Study"). Although Defendants claimed privilege over that study, their interrogatory responses stated that "as a result of the privileged 2013 compensation analysis" Merck made nearly $1.4 million in one-time increases in annual base salary to Sales Representatives. (*See* Ex. P-4, Defendants' Objections and Responses to Plaintiffs' Supplemental Interrogatories, served June 10, 2016.) Merck's responses also state that *99.2% of these adjustments made by Defendants went to female Sales Representatives*. In addition to withholding the 2013 Study, Defendants refused to provide the identities of the individuals who received compensation adjustments or the amounts received.

Defendants' privilege claim rings hollow. Other documentation produced by Defendants in August of 2016 reveals that the 2013 Study and resulting compensation adjustments actually arose from Defendants' introduction of the "Compensation and Career Framework" ("CCF") in late 2012/early 2013.[4] Specifically, in August 2016, Defendants for the first time produced a series of communications to Sales Representatives and their managers informing them of the one-time compensation adjustments and citing the launch of CCF as the impetus. (*See* Ex. P-5, a compilation of the compensation adjustment letters produced in August 2016.[5]) Other policy documents indicate that, as a regular business practice, Defendants relied on off-cycle salary adjustments to correct pay equity issues throughout the class period. (*See, e.g.*, Exs. P-6-P-9 MRK0036695-97, MRK0036814-16, MRK0036964-65, MRK0178405-13; MRK0189263-64.)

Although Defendants' June 10, 2016 supplemental interrogatory responses state that 1,001 employees received compensation adjustments, Defendants have produced the communications surrounding the compensation adjustments for *only eighteen (18) individuals*.[6] Plaintiffs therefore served a supplemental RPD requesting all outstanding compensation adjustment communications on February 23, 2017. Defendants responded with baseless objections and a refusal to produce the communications. (*See* Ex. P-10, Defendants' Objections and Responses to Plaintiffs' Eighth Set of Requests for Production of Documents.) Defendants' refusal to produce the requested

---

[3] Defendants assert that the parties discussed the existence of a privileged pay equity study during "a subsequent meet and confer," *infra*, yet they fail to identify when such a meet and confer took place, by what means it occurred, and who was present. Plaintiffs do not recall Defendants disclosing the existence of any pay equity studies prior to the Weber deposition.

[4] And indeed, Defendants do not contest that the 2013 Study was an outgrowth of the implementation of the CCF.

[5] Defendants produced similar documents for some of the Opt-In Plaintiffs who are participating in discovery in April 2017. (*See* Ex. P-12, a compilation of the compensation adjustment letters produced in April 2017.)

[6] Again, such communications are responsive to a RPD served by Plaintiffs in March 2015.

compensation adjustment communications exemplifies their obstructionist tactics. Indeed, Defendants waived all objections by partially producing the compensation adjustment communications in August 2016.

Nevertheless, Plaintiffs persisted in their attempts to obtain responsive documents without resorting to Court intervention. Plaintiffs raised Defendants' deficient responses to the pay equity study interrogatories and RPDs in correspondence on April 3, 2017, and suggested a telephonic meet and confer. (Ex. P-11.) Defendants ignored Plaintiffs' request to meet and confer for nearly three weeks. Eventually, Defendants responded to say that they would produce the rest of the compensation adjustment communications. (Ex. P-13.) Defendants offered no explanation for their about-face, leaving Plaintiffs to conclude that Defendants had no basis to withhold them for the past two years. Defendants subsequently offered to produce the list of adjustment recipients with a corresponding list of the amount of the adjustments they received, a compromise to which Plaintiffs agreed. To date, however, Defendants have produced neither the communications themselves nor such a list. Plaintiffs would accept either option.[7]

In their April 3, 2017 correspondence, Plaintiffs also requested that Defendants log any pay equity studies that they were withholding as privileged. (*See* Ex. P-11 at 4.) After Defendants ignored this request, on April 16, 2017 Plaintiffs again sought a privilege log containing the 2013 Study.[8] (*See* Ex. P-14 at 4, April 16 Correspondence from R. Kornblith.) On April 24, 2017—over two years after Plaintiffs requested all documents regarding any pay equity studies—Defendants finally produced a privilege log encompassing a single email referring to a single study (the 2013 Study). (*See* Exhibit P-15, Privilege Log.)

Two days later, on April 26, 2017, a witness for Defendants, Margan Mulvaney, mentioned the existence of at least one additional pay equity study covering employees in California (hereinafter, "the California Study"). (*See* Ex. P-16, Mulvaney Tr. at 56-64.[9]) Defendants failed to identify this study in their June 2016 interrogatory responses. Below, Defendants explain this omission by stating that "Defendants' counsel was unaware that this analysis had commenced at the time they responded to Plaintiffs' pay equity interrogatories in June 2016." Yet it was Mary Weber, the same corporate designee who Defendants produced as the person most knowledgeable on compensation at Merck, who informed Plaintiffs of the 2013 Study and alluded to another during her March 2016 deposition, who verified under penalty of perjury Defendants' June 2016 interrogatory responses. The fact that Defendants' counsel was unaware of the study therefore necessitates one of two possible conclusions: Either Ms. Weber did not adequately review the lawyer-generated June 2016 responses before verifying them, *or* Ms. Weber was likewise unaware of the California Study, meaning that Defendants failed to produce and prepare a witness competent to testify on compensation at Merck in accordance with Rule 30(b)(6) (a position already taken by Plaintiffs in

---

[7] Defendants now state that they "intend to produce a list to Plaintiffs that will set out the adjustments that each sales representative received in connection with the 2013 Compensation Analysis." The fact that Defendants are now, years later, finally complying with their discovery obligations is cold comfort. Plaintiffs look forward to such a list, but remain entitled to both the compensation adjustment communications and the underlying pay equity studies.

[8] Given that Plaintiffs articulated multiple specific requests for privilege logs on the pay equity studies, Plaintiffs' are puzzled by Defendants' invocation of their earlier agreement regarding the logging of privileged materials.

[9] Ms. Mulvaney's testimony indicated that she learned of the California Study from a colleague, outside the presence or direction of counsel. Counsel for Defendants, however, nonetheless instructed Ms. Mulvaney to answer no further questions regarding the study.

negotiations with Merck over myriad 30(b)(6) deficiencies). The latter option is particularly mysterious inasmuch as Ms. Weber testified that she prepared for her deposition with Merck Attorney Nicole Stovall, who purportedly "directed" the California Study. (*See* Ex. P-17, Weber Tr. at 8:12-16.)

2.   *Defendants Must Produce the Pay Equity Analyses*

Defendants' obstructionist conduct necessitates Court intervention. Plaintiffs are entitled to all pay equity studies completed during the relevant time period, as well as documents evidencing any resulting compensation adjustments.[10] Defendants have not demonstrated that the results of either pay equity analysis should be shielded from production because the documents produced to date show that the pay equity analyses served a business function. Indeed, the Court should at least review the withheld documents *in camera* to determine whether they could be produced with redactions. And, to the extent Defendants intend to rely on either analysis to prove or support any of their defenses, they waive any claim of privilege or work product protection.

a.   Defendants Bear a Particularly Heavy Burden to Prove Privilege

Defendants bear the burden of proving the existence and application of privilege. *See In re Grand Jury Investigation*, 918 F.2d 374, 385 n.15 (3d Cir. 1990). Privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974); *see also Zimmerman v. Norfolk Southern Corp.*, 706 F.3d 170, 181 (3d Cir. 2013) (Evidentiary privileges are interpreted narrowly.) Rule 26 favors full disclosure of relevant facts during discovery. *Spencer Sav. Bank, SLA v. Excell Mortg. Corp.*, 960 F. Supp. 835, 836 (D.N.J. 1997). In a case such as this one—filed under a remedial statute and with the purpose of eliminating systemic discrimination—the need for Defendants to adequately justify their assertions application of the attorney-client privilege or the work-product doctrine is particularly acute. Defendants fall far short.

The Third Circuit requires all claims of privilege to be sufficiently particularized to prevail. "It is not sufficient to merely state a generalized objection; instead, the objecting party must demonstrate that a particularized harm is likely to occur if the discovery be had by the party seeking it." *Tetris Holding, LLC v. Xio Interactive*, No. CV 09-6115 (FLW), 2011 WL 13141049, at *10 (D.N.J. June 20, 2011) (citing *G-69 v. Degnan*, 130 F.R.D. 326, 331 (D.N.J. 1990)). "The Third Circuit has rejected broadside invocations of privilege which fail to designate with particularity the specific documents or file to which the claim of privilege applies." *Torres v. Kuzniasz*, 936 F. Supp. 1201, 1208-09 (D.N.J. 1996). In order to analyze a privilege claim, courts have required the asserting party to provide "the date of the document, the name of its author, the name of its recipient, the name of all people given copies of the document, the subject of the document and the privilege or privileges asserted." *Westwood Prod., Inc. v. Great Am. E & S Ins. Co.*, No. CIV.A. 10-3605 MLC, 2011 WL 3329616, at *8 (D.N.J. Aug. 1, 2011) (citations omitted).

Defendants, by contrast, provide *no* particularized information about the documents they are withholding. Rather, Defendants repeatedly ignored Plaintiffs' requests for a privilege log on this

---

[10] If any other analyses exist, Defendants failure to disclose them to date is further evidence of their duplicitous conduct, and Plaintiffs would request an adverse inference. Also, to be clear, Plaintiffs do not seek attorney-client communications regarding the withheld analyses, or Counsel's evaluation of the analyses' legal implications. Plaintiffs seek only analyses' results exclusive of any privileged information interspersed with those results.

topic, and thereby prevented Plaintiffs from making more targeted requests for documents and information. Moreover, while Plaintiffs seek pay equity analyses, and specifically note that *they do not seek attorney-client communications*, Defendants continue to characterize all pay equity-related documents into the broad category of attorney-client communications in order to withhold an unspecified number of documents of unknown nature. Defendants' refusal to disclose even the volume and type of documents being withheld is at odds with the law in this circuit. At minimum, Defendants should be required to immediately produce a privilege log that includes the nature, dates, authors, recipients, subjects, and type of privilege asserted for all pay equity documents they are withholding.

Given the limited amount of time remaining in the discovery period, such a privilege log should, at minimum, be submitted to the Court along with unredacted versions of all contested documents for an immediate *in camera* review. This circuit has long held that "[t]he proper procedure for such consideration is that which the defendants asked for in the first place; in camera inspection by the court." *United Coal Companies v. Powell Const. Co.*, 839 F.2d 958, 966 (3d Cir. 1988) (citations omitted); *see also Durkin v. PACCAR, Inc.*, No. CV 10-2013 (JHR/AMD), 2011 WL 13137941, at *4 (D.N.J. Nov. 16, 2011) (ordering submission of a privilege log and documents to assess a claim of privilege). Defendants have evaded full and fair disclosure of this information for too long, and their claim of privilege should not be adopted wholesale on the brink of discovery's close absent the Court's review of the documents at issue.

        b.    The Pay Equity Studies Served a Crucial Business Purpose, and Fairness Demands Their Production

When a company conducts an internal employment analysis for business reasons, such as to determine whether pay is being distributed equitably, an attorney's involvement does not render the analysis privileged. *See, e.g.*, *Craig v. Rite Aid Corp.*, No. 4:08-CV-2317, 2012 WL 426275, at *1 (M.D. Pa. Feb. 9, 2012), *on reconsideration in part*, No. 4:08-CV-2317, 2012 WL 1079472 (M.D. Pa. Mar. 30, 2012) (holding that wage-sensitivity analysis was not privileged, despite evidence that the analysis was suggested by counsel, because the analysis was part of a larger restructuring analysis); *Smith v. Texaco, Inc.*, 186 F.R.D. 354, 356-57 (E.D. Tex. 1999) (holding that company's internal report reflecting employment data, including race, was not privileged because the study was generated from employee records maintained in the ordinary course of business even though the report was requested by counsel).

The limited information Defendants have produced to date necessitates the conclusion that the 2013 Study was generated as part of a "reassessment" of Merck's compensation structure, much like the documents at issue in *Craig v. Rite Aid*. Compensation adjustment letters produced to date specify that the adjustments were born from Merck's transition to the CCF. (Ex. P-5 at 3.) The implementation of CCF involved the mapping of every job in the Company into the newly established framework. Once that mapping process was complete, we engaged in a review of the compensation of our U.S.-based, non-union employees in similar jobs with similar experience, background credentials and performance. Based on the results of that review, we will be making one-time base pay adjustment to your base pay. Similarly, managers were told that the "implementation of CCF" provided the "opportunity to review internal consistency within the newly established framework for our non-Union, U.S. based population." (*Id.* at 1.) Other compensation policies specifically allow for off-cycle compensation adjustments as needed. (*See, e.g.*, Exs. P-6-P-9.) Merck's public-facing website even articulates the existence of a

Compensation and Benefits Committee, which, one responsibility of which is to "[r]eview risks related to the Company's compensation policies and practices and review and discuss, at such frequency as may be determined by the Committee, the relationship between the Company's risk management policies and practices, corporate strategy and compensation policies and practices."[11] Even the privilege log produced by Defendants on April 24, 2017, indicates that the 2013 Study was discussed by employees in the ordinary course of business. (*See* Exhibit P-15 at 14, noting discussion of a pay analysis in an email with the subject line "RE: Updated: Bi-Weekly Compensation Call – Agenda Feb 14th.")

Thus, Defendants have not "carried [their] burden to show that, irrespective of potential litigation, the [pay] analyses would not have been created, in essentially similar form, for a business purpose." *Zhao v. Deutsche Bank AG*, No. 13CV02116 (GBD) (DF), 2014 WL 12526256, at \*2 (S.D.N.Y. June 24, 2014). Because Defendants have not met their "burden to demonstrate that the documents in question are privileged or constitute work product, they should be produced." *Id.* At the very least, considering Defendants' questionable conduct with regard to the pay equity studies, the Court should have an opportunity to review them in chambers to assess the privilege claims and determine whether producing with redactions would be more appropriate. *Travelers Prop. Cas. Co. of Am. v. USA Container Co.*, No. 09CV01612JLLMAH, 2012 WL 12898823, at \*21 (D.N.J. Oct. 25, 2012), *report and recommendation adopted*, No. CV 09-1612 (JLL), 2012 WL 12903853 (D.N.J. Nov. 28, 2012).

c.   Defendants Waive All Privilege Assertions by Relying on Either Pay Equity Study

Finally, Merck's Fourth Affirmative Defense asserts that "Plaintiffs are not entitled to recover punitive or liquidated damages because Defendant has made a good-faith effort to comply with all applicable anti-discrimination laws and, at all relevant times, has acted reasonably, in good faith and without malice based upon all relevant information and facts and circumstances known by Defendant at the time it acted." (Dkt. 144 at 28.) To the extent Defendants intend to rely on any of the pay equity analyses to prove this or any other defense, they waive any claim of privilege or work product protection. *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1997) ("The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication."); *In re Human Tissue Prod. Liab. Litig.*, 255 F.R.D. 151, 158 (D.N.J. 2008), *appeal denied, judgment aff'd*, No. CIV. 06-135, 2009 WL 1097671 (D.N.J. Apr. 23, 2009) ("Courts have found an implied waiver of the attorney-client and/or attorney work product privilege where a client affirmatively places otherwise privileged information at issue in the case.").[12]

In sum, documents produced by Defendants to date indicate that the withheld pay equity analyses

---

[11] https://www.merck.com/about/leadership/board-of-directors/charter_compensation.pdf

[12] *See also Maar v. Beall's, Inc.*, No. 16-CV-14121, 2017 WL 823868 (S.D. Fla. Feb. 27, 2017) (finding that employer impliedly waived any attorney-client privilege with respect to requested documents that supported its affirmative defenses by putting its state of mind at issue when it asserted affirmative good faith defense); *Henry v. Quicken Loans, Inc.*, 263 F.R.D. 458, 470 (E.D. Mich. 2008) (finding that the employer's motion for summary judgment on the issue of good faith waived attorney-client privilege with respect to communications regarding employees' exempt classification).

stem from Defendants' ordinary course of business. Absent evidence that the pay equity analyses would not exist in substantially similar form but for the litigation, Defendants cannot shoulder their burden of proving privilege. Plaintiffs therefore request that the Court compel Defendants to produce the 2013 Study, the California Study, and any other heretofore unproduced pay equity analysis. At the very least, the Court should review the withheld documents to determine whether they should be produced with redactions.

      B.    *Defendants' Position*

Plaintiffs seek to compel the production of two analyses—(1) a compensation analysis that was conducted by outside counsel Morgan, Lewis & Bockius LLP (counsel to Defendants in this litigation) between 2011 and 2013 (the "2013 Compensation Analysis") and (2) an analysis of the compensation of California- and New York-based employees that was requested and directed by Defendants' in-house counsel (the "California Analysis"). Both of these analyses were for the purpose of providing/obtaining legal advice and are not part of a routine business process. On numerous occasions, including in written discovery responses, meet and confer conferences and depositions, Defendants have made clear the privileged nature of these analyses. Nevertheless, Plaintiffs continue to insist they are entitled to these materials. Plaintiffs are incorrect, and their motion to compel should be denied.

      1.    *Plaintiffs Have Long Known That Defendants' Conducted A Privileged Compensation Analysis.*

Contrary to Plaintiffs' suggestion, Defendants have repeatedly informed Plaintiffs of their position that the analyses in question are privileged—any assertion that Defendants have been obstructionist is false. On April 13, 2015, Defendants served their responses to Plaintiffs' First Set of Requests for Production, which included a request for "[a]ll documents relating to any internal or external compensation or promotion equity analysis." In response, Defendants objected to this request on a number of grounds, including that the information sought was protected by the attorney-client privilege. In a subsequent meet and confer in June 2015, Defendants noted the existence of a privileged pay equity study and agreed, subject to their other objections, to produce non-privileged documents that were responsive to this request. As demonstrated by Plaintiffs' Exhibit P-5, Defendants have made good on this agreement and produced the non-privileged communications to managers and employees regarding the 2013 Compensation Analysis that were identified during Defendants' ESI review.

During the March 23, 2016 deposition of one of Defendants' Rule 30(b)(6) witnesses, Mary Weber, Plaintiffs again raised the topic of the 2013 Compensation Analysis. Counsel for Defendants appropriately objected on the basis of privilege and instructed the witness not to answer many of the questions asked. After that deposition, the parties agreed that Plaintiffs would serve a set of interrogatories seeking non-privileged information regarding pay equity studies conducted by Defendants. Defendants responded to those requests on June 10, 2016. Defendants did not hear further from Plaintiffs on this issue until April 2017—nearly a year later—when Plaintiffs indicated that they intended to file a motion to compel the 2013 Compensation Analysis. At that time, counsel for the parties conferred, and Plaintiffs' counsel raised Plaintiffs' request for a break-down of the adjustments or communications received by each sales representative. Plaintiffs made clear, however, that the production of this information would not resolve the underlying dispute regarding whether Plaintiffs are entitled to clearly privileged analyses. That

aside, Defendants do intend to produce a list to Plaintiffs that will set out the adjustments that each sales representative received in connection with the 2013 Compensation Analysis.[13]

With respect to the California Analysis, Defendants' counsel was unaware that this analysis had commenced at the time they responded to Plaintiffs' pay equity interrogatories in June 2016. However, they now understand that this analysis was conducted to assess legal risk relating to the enactment of the California Fair Pay Act as well as an amendment to the New York Equal Pay Law (statutes which are not at issue in this case).  Ex. D-1, Declaration of Nicole Stovall, Esq. ("Stovall Decl.") at ¶ 2.  No adjustments to sales representatives' salaries were made in connection with this analysis.  *Id.* at ¶ 5.  Defendants will supplement their interrogatory responses to address this analysis.

With respect to the logging privileged materials relating to both the 2013 Compensation Analysis and the California Analysis, Defendants would note that they have logged all materials that are required to be logged pursuant to the parties' June 2015 agreement, which was confirmed in a July 1, 2015 letter.  Ex D-2, Letter from K. Katzenstein to D. Marcuse.  Specifically, the parties agreed that October 12, 2011 is the cutoff date for purposes of logging privileged information such that only documents created before that date must be logged.  *Id.*  Plaintiffs now argue, at the eleventh hour, that this agreement should be set aside, and Defendants should be required to log the analyses in question.  However, there is no reason to disregard the parties' agreement—Plaintiffs now have more information establishing the privileged nature of the analyses in question than any log could possibly provide.  Indeed, Defendants have submitted three attorney declarations with this filing that demonstrate these analyses are plainly privileged.

In short, Defendants have provided Plaintiffs with non-privileged information relating to the 2013 Compensation Analysis as well as information demonstrating that this analysis and the California Analysis are protected by the attorney-client privilege.  They have also logged privileged materials as appropriate.  Nevertheless, Plaintiffs continue to demand privileged information.

      2.     *The 2013 Compensation Analysis And The California Analysis Are Protected From Disclosure By The Attorney-Client Privilege.*

The 2013 Compensation Analysis and the California Analysis are protected by the attorney-client privilege because both were directed and prepared by outside and/or in-house counsel for the purpose of providing legal advice.  The attorney-client privilege protects from disclosure communications that are made between an attorney and his/her client in confidence for the purpose of obtaining or providing legal assistance.  *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007), *as amended* (Oct. 12, 2007); *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir. 1994).  The purpose of the attorney-client privilege is to "encourage full and frank communications between attorneys and their clients . . . The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon

---

[13] It is important to note that Defendants have already produced complete compensation and human resources data for all sales representatives.  Plaintiffs can analyze these data any way they wish and argue any conclusions they wish. Nonetheless, Defendants will also produce the list of individuals who received pay adjustments in connection with the 2013 Compensation Analysis, even though Plaintiffs persist in seeking the privileged information.

the lawyer's being fully informed by the client" *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

"[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn.*, 449 U.S. at, 384.  Accordingly, the privilege extends to information that is prepared by third parties (e.g. consultants or data analysts) who are retained by counsel and work at counsel's direction to supply the information needed to allow counsel to give sound legal advice. *See Louisiana Mun. Police Employees Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 311 (D.N.J. 2008) ("The concept of the attorney-client privilege extending to third-party agents" has included "specialists in a variety of social and physical sciences"); *Cottillion v. United Refining Co.*, 279 F.R.D. 290, 305 (W.D. Pa. 2011) (holding e-mail from outside counsel to outside consultants was privileged, when counsel directed consultant to provide and interpret data in order to assist outside counsel in furnishing legal advice and formulating legal strategy); *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 476-77 (E.D. Pa. 2005) (*citing In re Grand Jury Investigation*, 918 F.2d 374, 386 n.20 (3d Cir. 1990)) ("Presence of a third-party, such as a consultant, does not destroy the attorney-client privilege where that party is the client's agent or possesses 'a commonality of interest with the client.'"); *Smith v. Texaco, Inc.*, 186 F.R.D. 354, 357 (E.D. Tex. 1999) (holding that "interpretive material comprised of tables, lists, statistical analyses, and graphical representations of the data" prepared for legal department that reviewed race and employment information was privileged).

While Plaintiffs acknowledge that they are not entitled to privileged communications relating to the 2013 Compensation Analysis, they nevertheless maintain the analysis itself is discoverable. Plaintiffs are wrong—the analysis is plainly protected by the attorney-client privilege.  In-house counsel Axel Johnson retained outside counsel, Michael Burkhardt and Blair Robinson of Morgan, Lewis & Bockius LLP, also counsel of record in this case, to *conduct and direct* the 2013 Compensation Analysis and provide legal advice based on the results of the analysis.  *See* Ex. D-3, Declaration of Blair J. Robinson, Esq. ("Robinson Decl.") at ¶ 2; Ex. D-4, Declaration of Axel Johnson, Esq. ("Johnson Decl.") at ¶ 2.  Mr. Robinson directed the company as to which data to gather and, in consultation with an external consultant, advised the company on the methodology for conducting the analysis.  Robinson Decl. at ¶ 3.  Mr. Robinson reviewed the analysis, and based on the analysis he directed, provided legal advice to Defendants' in-house counsel.  *Id.* at ¶ 4.  He also instructed that the analysis was to be maintained confidentially and disseminated only as needed to allow him to provide legal advice.  *Id.* at ¶ 4; *see also* Johnson Decl. at ¶ 5.  The 2013 Compensation Process was not part of a routine human resources process, but rather was a single project organized and overseen by Mr. Robinson, at the request of Defendants' in-house counsel, for the purpose of providing legal advice.  Robinson Decl. at ¶¶ 3, 5; Johnson Decl. at ¶¶ 2, 3.  In short, the primary purpose of the 2013 Compensation Analysis was to enable Mr. Robinson to provide legal advice to his client and is without question privileged.

The California Analysis is likewise protected by the attorney client privilege.  In response to the enactment of the California Equal Pay Act and the New York Fair Pay Law, Defendants' in-house counsel Nicole Stovall directed the preparation of a compensation analysis that focused on employees who work in California and New York.  Ex. D-1, Stovall Decl. at ¶ 2.  The purpose of the analysis was to allow Ms. Stovall to assess whether the company faced any risk under the new/amended statutes and to provide appropriate legal advice based on the results of the analysis.

*Id.* at ¶ 3. Ms. Stovall directed the data that were to be gathered for the analysis and instructed an MSD employee regarding how the data should be analyzed. *Id.* at ¶ 4. She then reviewed the results of the analysis for the purpose of providing legal advice to her client. *Id.* Throughout the project, Ms. Stovall made clear that the analysis, which is not conducted in the ordinary course, was being conducted at her direction for the purpose of providing legal advice and should not be disseminated. *Id.* at ¶¶ 6, 7. It is therefore protected from disclosure by the attorney client privilege.

Plaintiffs cannot escape the conclusion that the analyses are privileged by speculating that they must have been conducted for business purposes. Where, as here, the purpose of the communications is predominately, if not exclusively, legal, the privilege applies. *See Leonen v. Johns-Manville*, 135 F.R.D. 94, 99 (D.N.J. 1990); *see also Se. Penn. Transp. Auth. v. Caremarkpcs Health, L.P.*, 254 F.R.D. 253, 257 (E.D. Pa. 2008) ("the mere fact that business concerns may have motivated the communication at issue does not render the documents unprivileged because the Court finds that any business decisions being made were infused with legal concerns and were reached only after securing legal advice." (internal quotations and citation omitted).) "Because it is often too difficult, impractical and unrealistic to compartmentalize whether certain advice given to a client is legal in nature or business . . . the policy behind the attorney-client privilege is best upheld . . . where the attorney-client relationship is predominantly for the purpose of rendering legal services." *Louisiana Mun.*, 253 F.R.D. at 306 (internal quotations and citation omitted). "Consequently, the proper inquiry is focused on whether the communication is designed to meet problems which can fairly be characterized as predominantly legal." *Munich Reinsurance Am., Inc. v. Am. Nat. Ins. Co.*, No. 09-6435, 2011 WL 1466369, at *18 (D.N.J. Apr. 18, 2011).

Here, as Defendants have repeatedly told Plaintiffs, the evidence is overwhelming that the analyses in question were created by counsel and for the purpose of providing legal advice. The declarations of Mr. Robinson, Mr. Johnson and Ms. Stovall make clear, that the analyses were conducted in response to concerns regarding legal risk, were conducted for the purpose of assessing that risk and providing appropriate legal advice, and were directed by outside and/or in-house counsel. These declarations alone are sufficient to establish that the purpose of the analyses was legal and the attorney-client privilege attaches. *See Se. Pennsylvania Transp.* 254 F.R.D. at 261–62 ("[T]he Court finds that [in house counsel's] affidavit proclaiming that the contested e-mails reveal her legal advice to her clients is sufficient to establish that they were privileged, regardless of whether or not she was the sender."); *RCN Corp. v. Paramount Pavilion Group LLC*, 2003 WL 23112381, at *3–4 (E.D.Pa. Dec. 19, 2003) (holding that in-house counsel's affidavit that he was only involved in the communications in his legal capacity was sufficient to establish privilege when the opposing party merely accused him of acting in a business capacity in its brief).

Furthermore, none of the cases Plaintiffs cite suggest a different result. First, Plaintiffs description of *Smith v. Texaco, Inc.*, 186 F.R.D. 354, 357 (E.D. Tex. 1999), is simply incorrect. There, the court noted that the report in question contained employee data (like those Defendants have already produced) as well as "interpretive material comprised of tables, lists, statistical analyses, and graphical representations of the data." While the court found that the actual data was discoverable, the court held that the graphs and analyses were covered by the attorney-client privilege. *Id.* Here, the materials Plaintiffs seek are identical to those that the *Smith* court found to be privileged. Second, in *Craig v. Rite Aid Corp.*, No. 4:08-CV-2317, 2012 WL 426275, at *14 (M.D. Pa. Feb. 9, 2012), the documents in question consisted of emails between the former senior director of

payroll and compensation and a senior manager of payroll compensation that discussed "very general information, and some questions, regarding the requested wage sensitivity analysis, comparing pay rates for assistant managers and shift supervisors by region, and about what the financial impact would be if Rite Aid had these employees' base hours reduced." Unlike here, there was no lawyer on these emails and no indication that they were created or shared for the purpose of obtaining legal advice. *Id.* This was also the case in *Zhao v. Deutsche Bank AG*, No. 13CV02116, 2014 WL 12526256, at *2 (S.D.N.Y. June 24, 2014), where the court concluded that there was insufficient evidence to demonstrate that the analyses in question "were actually created for counsel, for the purpose of obtaining legal advice." That is simply not true here.

Plaintiffs' argument that the 2013 Compensation Analysis was conducted for business purposes is also undermined by the very evidence they cite.

- First, the company's communications to employees and managers regarding base pay adjustments show that it was necessary for the company to explain why employees were receiving what might otherwise be perceived as an unusual adjustment. That these communications cite the CCF project does not mean that the 2013 Compensation Analysis was initiated in connection with that project—it was not. As the Declaration of Mr. Johnson explains, this analysis was initiated at his request for purposes of obtaining legal advice. Johnson Decl. at ¶ 2. Nor do these communications convert legal analyses into non-privileged information.

- Second, the declarations submitted herewith demonstrate that the 2013 Compensation Analysis and California Analysis were not conducted pursuant to the off-cycle compensation policy. Johnson Decl. at ¶ 3; Stovall Decl. at ¶ 6. The existence of this policy is therefore irrelevant.

- Third, the existence of a Compensation and Benefits Committee and its responsibility to "[r]eview risks related to the Company's compensation policies and practices" also has no bearing on the purpose of the 2013 Compensation or California Analyses. These analyses were not conducted at the direction of that Committee or in connection with its activities. These were separate analyses initiated and directed by counsel for the purpose of providing legal advice. Johnson Decl. at ¶¶ 2, 3; Stovall Decl. at ¶ 6.

- Fourth, the fact that the company's compensation team was provided with an update regarding the 2013 Compensation Analysis is in no way an indication that it was routinely discussed or is not privileged. Again, the Declaration of Mr. Johnson makes clear that the analysis was not routinely discussed. Johnson Decl. at ¶ 3.

In short, neither the law nor the evidence that Plaintiffs put forward undermine the declarations of in-house and outside counsel, which clearly demonstrate that the analyses in question are protected by the attorney client privilege. Nor should it. If analyses such as those at issue, which were done at the direction of counsel to obtain/provide legal advice, were discoverable, there would be a chilling effect on companies' good faith efforts to undertake such measures. This result would be particularly unfortunate where, as here, there is no prejudice to the opposing party—indeed, Plaintiffs have full compensation data and can study it any way they wish and make any arguments they wish  Accordingly, Plaintiffs' motion to compel should be denied.

3.   *Defendants Have Not Waived The Attorney-Client Privilege.*

Although Plaintiffs previously argued that Defendants waived the attorney-client privilege simply by asserting an affirmative defense that they "made good-faith efforts to comply with all applicable . . . laws" and have acted "in good faith . . . based upon all relevant information and facts and circumstances known by Defendants at the time they acted" (Dkt. 144 at p. 28), they now recognize this is not so.  In fact the Third Circuit has expressly rejected the argument that the mere assertion of a defense constitutes a waiver of the attorney client privilege.  In *Rhone-Poulenc Rorer Inc.*, 32 F.3d 851, the Third Circuit explained:

> Advice is not in issue merely because it is relevant, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner.  The advice of counsel is placed in issue where the client asserts a claim or defense, *and attempts to prove that claim or defense by disclosing or describing an attorney client communication.*

32 F.3d at 863 (citations omitted) (emphasis added); *see also Berardino v. Prestige Mgmt. Servs., Inc.*, No. 14-3451, 2017 WL 1084523, at *5 (D.N.J. Mar. 21, 2017) ("[T]he Third Circuit explicitly rejected [plaintiff's] argument here—that by asserting the affirmative defense of good faith, [defendant] has impliedly waived its privileges"); *McKee v. PetSmart, Inc.*, 71 F. Supp. 3d 439, 441-42 (D. Del. 2014) ("The court concludes that defendant has not waived the attorney-client privilege by asserting a good faith affirmative defense because defendant has not relied on privileged communications or testimony in support of its defense"); *Astrazeneca LP v. Breath Ltd.*, No. 08-1512, 2010 WL 11428457, at *6 (D.N.J. Aug. 26, 2010) (denying motion to compel when there was testimony referring to communications with counsel but when defendant did "not attempt to justify its conduct or limit its liability by asserting that it *relied on the advice of counsel* which would thereby place the advice of counsel in issue" (emphasis added)).

Here, Defendants have no intention of relying on the 2013 Compensation Analysis or the California Analysis to establish their good faith defense.  These analyses therefore are not at issue, and there has been no waiver of the privilege.  For this reason too, Plaintiffs' efforts to obtain privileged information should be denied.[14]

## II.   Employee Identification Numbers for Male Comparators

A.   *Plaintiffs' Position*

Plaintiffs seek the information necessary to locate male comparators identified by Opt-in plaintiffs in the pay data produced by Defendants. In other words, in this class-wide pay discrimination case, Plaintiffs seek access to the names of all potential male comparators in the anonymized pay data produced by Defendants. These names are "nonprivileged matter that is relevant to [Plaintiffs'] claims." *See* Fed. R. Civ. P. 26(b)(1). Rule 26 clearly entitles Plaintiffs to this information, and Defendants must produce it.

---

[14] Defendants also note that *in camera* review is not necessary here because the issue is not the content of the statistical analysis but rather whether it was conducted by counsel for the purpose of providing/obtaining legal advice, which the record demonstrates is clearly the case.

1.  *Plaintiffs First Requested Identifiable Pay Data in March 2015*

Plaintiffs' first RPD, served on March 9, 2015, sought, *inter alia*, "information . . . concerning . . . for each Sales Representative at Merck . . . name of the employee; . . . compensation rate and commissions, incentives or bonuses by pay period of the employee at Merck;. . . [and] payroll information of the employee at Merck." Defendant (then only Merck & Co., Inc.) responded that "it w[ould] produce data from Merck's SAP human resources database relevant to Plaintiffs' claims and the proposed class set forth in the Complaint." (Ex.P-1.) In response, however, Defendants produced only anonymized pay data, wherein Merck replaced all employee names with "Unique IDs" seemingly generated for this litigation.

Apparently recognizing the limited utility of Unique IDs, Defendants agreed to re-identify the pay data piecemeal for individuals specifically identified as comparators by the Named Plaintiffs. Merck affirmed this compromise on July 1, 2015, stating that it had "produced the unique IDs of the individuals identified as alleged comparators in the Amended Complaint and Plaintiffs' Interrogatory responses." (Ex. P-18.) In October 2015, the agreement was extended to opt-in plaintiffs: "As Plaintiffs identify the names of opt-in plaintiffs and specific alleged comparators, Merck will provide the Unique ID numbers for those individuals to the extent the information is available in the data." (Ex. P-19.)

2.  *Defendants Continued to Decode Unique IDs Until March 2017*

This compromise largely held for two years. Although Defendants were often tardy in responding to Plaintiffs' requests, Plaintiffs' repeated prodding eventually garnered the requested discovery. Throughout the month of January 2017, as opt-in discovery began in earnest, Plaintiffs continued to request the Unique ID numbers of an ever-growing list of named comparators from Defendants. After producing approximately 292 names and IDs in January, 169 in February, and 102 in March, however, Merck has failed to produce any names and IDs since March 28. Currently, 409 requests for names and IDs remain outstanding.[15] Despite Merck's commitment on the eve of the April 24th conference with this Court to produce all outstanding names by week's end, it has not done so.[16]

3.  *Defendants Renege on the 2015 Agreement and Refuse to Produce Further De-Anonymized Information Based on Indefensible Legal Arguments*

---

[15] Merck claimed 142 of these individuals were unidentifiable. Numerous examples, however, contradict this. For example, on February 22, Plaintiffs followed up on an allegedly unidentifiable comparator, "Skipper" Kozelsky, noting that he was identified on LinkedIn as a current Merck sales representative. Not until March 6 did Merck respond that it had identified a "Louis Kozelsky" in the data. On March 7, Plaintiffs confirmed that Louis and Skipper Kozelsky were one and the same, and further provided 45 additional LinkedIn pages for allegedly unidentifiable representatives. Nevertheless, despite repeated requests over the intervening two months, Merck has yet to produce a Unique ID for Mr. Kozelsky, or for the other 45 allegedly unidentifiable representatives tracked down by Plaintiffs.

[16] During a meet and confer on April 24, Plaintiffs affirmed their intent to bring this issue to the Court's attention during the conference later that day. To avoid Plaintiffs raising this issue before the Court, counsel for Merck committed to producing most outstanding names by close of business April 25, and all remaining names by Friday April 28. More than a week later, however, Merck had neither produced the more than 400 names still outstanding nor responded to Plaintiffs' multiple emails requesting an update. Not until May 4 did Merck again propose producing the already-promised, never-delivered names if Plaintiffs would agree to drop the issue before the Court. Based on the history to date, however, Plaintiffs at this point are compelled to seek full production of all names and Unique IDs to ensure that they have what is needed for class certification given the impending close of discovery.

Defendants now refuse to produce any further Unique IDs for even those comparators named by opt-in plaintiffs. According to their position statement below, they do so because "it has become clear that Plaintiffs' counsel is not using the information to verify or properly identify comparators because Plaintiffs' Counsel is clearly not using the information provided to respond to Interrogatory No. 1." This argument ignores that *Defendants already have this data in full, and thus have no need of it,* and fails to address Plaintiffs' entitlement to the data under Rule 26.

*First*, Plaintiffs are entitled to this information because it is "nonprivileged matter that is relevant to [Plaintiffs'] claims," namely that Defendants paid Plaintiffs and the class of female sales representatives less than similarly situated male sales representatives. *See* Fed. R. Civ. P. 26(b)(1). This information, among other uses, will facilitate further investigation into whether male representatives at Merck performed work of "equal skill, effort, and responsibility, . . . under similar working conditions," 29 U.S.C. § 206(d)(1), an essential piece of what Plaintiffs must prove in this case going forward.

The relevance of this information, if it were ever in doubt, is confirmed by Defendants' own deployment in this litigation of the same names to which they have denied Plaintiffs access. (*See infra.*) Moreover, Courts have often compelled the production of similar information. *See, e.g., Thibeault v. Scap Motors, Inc.*, No. CIV. 3:04CV1936(JCH), 2006 WL 236767, at *1 (D. Conn. Jan. 18, 2006) (ordering defendant to produce "identify by name, gender, address and telephone number all Sales Managers and . . . the salary, commission rate, pay structure, bonus amount and/or rate, and any other benefits offered and/or paid to these managers"); *Miklos v. Golman-Hayden Cos., Inc.*, No. CIV.A.2:99-CV-1279, 2000 WL 1617969, at *1 (S.D. Ohio Oct. 24, 2000) (compelling defendants to produce "the names and addresses of all persons at all [company] locations who perform the same job duties . . . and produce all records of compensation for said persons"). Accordingly, this information must be produced.

*Second*, Defendants' contention that Plaintiffs should have taken steps to de-anonymize Merck's data *before sending it back to Merck* in their interrogatory responses ignores both the question asked in Defendants' interrogatories and Plaintiffs' proper objections thereto. Defendants' Interrogatory No. 1 to Opt-in Plaintiffs asks Plaintiffs to "Identify *all male MSD/Intervet employees* who you believe were *paid more than you for performing similar work*." (emphasis added) Plaintiffs have consistently taken the position, as expressed in their conditional certification papers, that "*[a]ll Merck Sales Representatives perform the same essential duties and responsibilities*, namely promoting Merck's products to healthcare providers." (Dkt. 78-1 at 7, emphasis added.) It should therefore come as no surprise to Defendants that when Merck requested that Plaintiffs identify "*all* male MSD/Intervet employees who you believe were paid more than you for performing similar work," Plaintiffs did just that: using the anonymized data provided by Merck, they provided identification numbers of *all* "[]male Merck Sales Representatives[ who] were compensated more in base salary and/or total compensation (W-2 Box 5) than Opt-in Plaintiff[s] during at least one year between 2011 and 2015."[17] To answer the question actually

---

[17] Defendants' complaint that Plaintiffs have provided "lawyer drafted interrogatory responses" is both beside the point and astonishing given Merck's explanation for inaccurate statements in its client-verified pay equity interrogatory answers (namely the ignorance of the outside counsel who drafted the answers, which also calls into question what Ms. Weber knew when she signed the responses). Lawyers regularly draft interrogatory responses. Such drafting is particularly appropriate where, as here, "this Interrogatory's phrases paid more than you' and 'performing similar work' are vague, ambiguous, and *call for legal conclusions* insofar as the questions of how to calculate

asked by Merck in any other way (for example, by omitting the large number of men paid more for the same work whose names had not been provided by Merck) is incompatible with Plaintiffs' basic argument in this case regarding the nature of sales representative duties.

Defendants next assert that Plaintiffs should have made "an effort to use the previously provided information to verify proper comparators or to supplement their interrogatory responses." First, the parties plainly disagree as to who is a "proper comparator;" indeed, the substance of this disagreement will likely be a central issue in the class certification arguments soon to come. Second, Merck now demands Plaintiffs answer a question that Defendants could have asked but did not, such as "Identify, *by name*, all male MSD/Intervet employees, *of whom you have personal knowledge*, who you believe were paid more than you for performing similar work, *as verified by Defendants' data*."

Further, when Defendants have actually asked these questions in many opt-in depositions taken over the last months, they have obtained the testimony that they seek. For example, when Defendants asked an Opt-in Plaintiff Moorcroft "Do you know the names of individual men that are included on the list of numbers that was Exhibit A to your interrogatory responses?" she responded "Two." (Ex. P-20, Moorcroft Deposition Tr.) And when Defendants asked Opt-in Plaintiff Webber, "Are there any male representatives that you specifically believe were paid more than you from 2009 to the present?" and then asked her, "Can you name them?" she responded, "Todd Ray." (Ex. P-21.) Likewise, when Defendants asked Opt-in Plaintiff Vitale "At the time that you signed this document, were there particular men who you believe were paid more than you while you worked at Merck?" Ms. Vitale responded, "Christian Momm, Mark Piotrowski." (Ex. P-22.)

Regardless of whether Defendants' inartful interrogatories failed to elicit the information that Defendants apparently seek, Defendants' disappointment does not justify their failure to live up to discovery obligations that preceded these interrogatories by nearly two years.[18]

4. *Defendants Have Exploited Their Failure to Produce this Discovery for Litigation Advantage*

Alarmingly, Defendants have also deployed their discovery deficiencies as a sword in the deposition of Opt-in Plaintiffs. For example, on February 3, 2017, Plaintiffs' Counsel sought the Unique ID of Ryan Deveney. On February 15, 2017, Defendants' Counsel professed to be unable to identify Mr. Deveney in Defendants' data. During the deposition of Opt-in Plaintiff Linda Cieresewski, however, Defendants' Counsel "represent[ed] to [Ms. Cieresewski] that James Deveney received a lower base salary than [her] in 2011 and 2012." Counsel then asked Ms. Cieresewski, "Do you think that it was unfair to him that your salary was higher?" (Ex. P-23.) By improperly withholding discoverable information and then using that information to ambush an Opt-In Plaintiff, Defendants abuse the discovery process.

In sum, Plaintiffs are entitled to the names of Merck's male Sales Representatives and their

---

compensation and what constitutes 'similar work' are both legal questions that may be litigated in this case." (emphasis added)

[18] Notably, Defendants have never sought the Court's intervention to compel Plaintiffs to respond to their interrogatory responses in the manner they now demand.

identified pay data. In an attempt at compromise, Plaintiffs initially agreed to reduce the scope of this request. Defendants have now more than reneged on that compromise, and Plaintiffs therefore request that the Court compel Defendants to produce the names and corresponding Unique IDs for all sales representatives employed by Merck since 2009.

        B.    *Defendants' Position*

Plaintiffs' counsel's asserted need for so-called comparator information is disingenuous. In 2015, when individuals began to opt-in to Plaintiffs' Equal Pay Act claim, the parties agreed in good faith that if Plaintiffs identified potential comparators by name, Defendants would attempt to match the names and provide unique IDs to link to the HR data that has been produced in this case. Defendants did this at Plaintiffs' request and without requiring formal discovery requests. The intent was that Plaintiffs would use this information to verify in the data whether the individuals their clients' presumably identified as comparators were in fact proper pay comparators.

Thereafter, with the Court's assistance, the parties agreed to a limited discovery process for opt-in plaintiffs, and Defendants served a limited set of interrogatories on 120 of the opt-in plaintiffs, which included a question asking that the opt-in plaintiffs identify the male employees who they— not their counsel—believe were paid more than them for performing similar work. Specifically, Interrogatory No. 1 requested that each "[i]dentify all male MSD/Intervet employees who [she] believe[s] were paid more than [her] for performing similar work." (*See, e.g.,* Ex. D-5, Exemplar Set of Interrogatories.) Given that these were interrogatory requests, Defendants did not spell out the self-evident proposition that they were seeking the opt-in plaintiffs' personal knowledge.

Defendants continued the informal practice of linking "comparator" names provided by Plaintiffs' counsel with unique IDs even after the Court-ordered opt-in discovery process commenced.[19] However, during the course of opt-in discovery, it has become clear that Plaintiffs' counsel is not using the information provided to verify or properly identify comparators. Indeed, Plaintiffs' counsel is making no effort to use this information as the basis for responding to Interrogatory No. 1. In fact, in their interrogatory responses, the opt-in plaintiffs *have not* identified any names of alleged comparators. Rather, Plaintiffs' counsel has provided lists of hundreds, and in some cases of over 1,000, unique IDs of alleged comparators. According to the lawyer-drafted interrogatory responses, these are purportedly the IDs of the men whom the opt-in plaintiffs believe are comparators that were paid more for performing similar work. Given that Plaintiffs' counsel has made no effort to use the previously provided information to verify proper comparators or to supplement their interrogatory responses, it is simply inaccurate to say (as Plaintiffs do above) they need the requested information to locate male comparators identified by opt-in plaintiffs. If that were the case, then Defendants should be receiving specific names of comparators in response to Interrogatory No. 1.

Furthermore, deposition testimony has made it clear that these lists do not reflect the individuals whom the opt-in plaintiffs actually contend are their comparators. In fact, in many instances, the opt-in plaintiffs have testified that they have no idea what these numbers mean much less how they

---

[19] The process of matching names from Plaintiffs' counsel to HR data is time consuming and burdensome, particularly given the many times, the names provided are misspelled or incorrect names.

were compiled and why these individuals are legitimate comparators.  For example, opt-in plaintiff Kimberley Peoples testified:

Q.      What do these numbers mean to you?

A.      Not much. I mean, nothing.

Q.      Do you know what they represent?

A.      No.

Q.      Do you know how this list was compiled?

A.      No.

Q.      So you don't know what these numbers mean at all?

A.      No.

(Ex. D-6, Deposition of Kimberley D. Peoples at 85:20 − 86:6; *see also* Ex. D-7, Deposition of Pamela Dickey at 181:7-12 ("Q.  Do you know what they are? Do you know what these numbers are?  A.  These are -- are they salaries?  Q.  I'm asking you. These are your responses. Do you know what they are?  A.  No."); Ex. D-8, Deposition of Mary Patricia Holihan at 52:7-9 ("Q:  Do you believe this [list] reflects individuals who were paid more than you?  A:  I have no idea what this list is.")) Ex. D-9, Rough Deposition of Denise Jones at 77:4-6 ("Q:  And what are these numbers?  A:  I have no knowledge.  I mean, I don't know what those numbers regard.")  Several other opt-in plaintiffs have offered similar testimony.

This testimony demonstrates that Plaintiffs' counsel is creating the comparator lists and not verifying any of the information from the name lists that were previously being provided  Thus, there is simply no basis for Defendants to have to continue to respond to lists from Plaintiffs' counsel that are not even being used to properly respond to formal discovery requests.

## III.     The Deposition of Robert McMahon

### A.     *Defendants' Position*

#### 1.     *The Apex Doctrine Precludes Mr. McMahon's Deposition.*

Plaintiffs have noticed the deposition of Robert McMahon, Merck, Sharp & Dohme Corp.'s ("MSD") President of Global Human Health for the U.S. Market.  Mr. McMahon should be shielded from deposition under the apex doctrine.[20]  The "apex" doctrine creates a "rebuttable presumption that a high-level [corporate] official's deposition represents a significant burden" and that the burden is undue under the Federal Rules of Civil Procedure unless there is no alternative that is more convenient, less burdensome, and less expensive.  *See United States ex rel. Galmines*

---

[20] This Court has broad discretion to limit discovery under Rule 26(c) to protect any party from "annoyance, embarrassment, oppression, or undue burden or expense" by issuing a protective order on a showing of good cause. *See* Fed. R. Civ. P. 26(c)(1).  This broad discretion applies equally to protective orders issued pursuant to the apex doctrine.  *Reif v. CNA*, 248 F.R.D. 448, 451, 454 (E.D. Pa. 2008) (noting in context of analysis of apex doctrine challenge that "[c]ourts have significant discretion when resolving discovery disputes") (citation omitted).

*v. Novartis*, 2015 WL 4973626, *2 (E.D. Pa. Aug. 20, 2015). Mr. McMahon is President of MSD's Global Human Health business in the United States, which includes marketing, business operations and sales, and as such, is the highest ranking executive for MSD's Human Health business in the United States. There are many layers of management between Mr. McMahon and sales representatives, and as detailed below, there is no factual basis to support that Mr. McMahon had personal involvement in the decisions at issue in this case. Nor does he have any information that could not have been obtained through the numerous other depositions that have already occurred in this case. Accordingly, Defendants move for protective order pursuant to the apex doctrine.[21]

Where a party seeks an apex witness like Mr. McMahon, the apex doctrine "instructs courts to consider whether the high-level official has personal or superior unique knowledge of the facts alleged and whether the information could be obtained from lower level employees or through less burdensome means." *Id.* at *1; *York Group, Inc. v. Scott Pontone*, No. 10-1078, 2012 WL 12895759, at *4-6 (W.D. Pa. June 15, 2012) (denying depositions of high level executives where they lacked "unique knowledge beyond what Plaintiffs have already obtained through the extensive discovery that has taken place in this case"); *Taggart v. Wells Fargo Home Mortg., Inc.*, No. 10-00843, 2012 WL 4462633, at *3 (E.D. Pa. Sept. 27, 2012) (granting motion for protective order to prevent deposition of former vice president who had no first-hand knowledge of particular issue and individual with such knowledge was already deposed); *Roman v. Cumberland Ins. Grp.*, No. 07-1201, 2007 WL 4893479, at * 1 (E.D. Pa. Oct. 26, 2007) (preventing deposition of high-ranking officials because lower-ranking employee with firsthand knowledge was available for deposition); *see also Novartis*, 2015 WL 4973626, *2 (denying deposition of executive where plaintiff "ha[d] not articulated why the information sought . . . could not be obtained from lower level employees or through less burdensome means" and noting "[t]his silence is particularly deafening in light of the posture of discovery in this case: [plaintiff] ha[d] deposed six corporate representatives of Novartis and 12 fact witnesses" and had made no "effort to ascertain from these deponents the extent of [the executive's] personal involvement in the alleged actions"). And where the non-moving party fails to overcome the presumption that the deposition would violate the proportionality standard, the deposition should be denied. *Novartis*, 2015 WL 4973626, *2.

Here, Plaintiffs cannot articulate any legitimate basis to overcome the presumption that they are not entitled to Mr. McMahon's deposition. *See Novartis*, 2015 WL 4973626 at * 2 (rejecting "generic assertions" that high-level executive was involved in relevant discussions). There is no evidence that Mr. McMahon was involved in any decisions relating to this matter. Nor can Plaintiffs show that he has any unique or superior knowledge or information that could not have been obtained from other witnesses. Indeed, Mr. McMahon is the sender or recipient of fewer than 50 of the **34,000** documents (comprising over 229,000 pages) that Defendants have produced in this case, and the majority of these documents relate to either Career Pathways (a job grading project) or sales incentive plans—topics on which Plaintiffs have already had Rule 30(b)(6) witnesses and about which they have already questioned several fact witnesses. In fact, Plaintiffs have already taken multiple Rule 30(b)(6) depositions on topics such as compensation, promotions, and performance evaluations and 14 fact witness depositions that purported to relate to the facts in this case. In other words, this is the precise scenario where an apex witness with no

---

[21] Because of Mr. McMahon's work demands, Defendants have not yet been able to secure a declaration from him on these issues. Should the Court believe that a declaration will assist it in resolving this dispute, Defendants will provide one during the week of May 8 that confirms the facts set forth above

personal, unique or superior knowledge should be shielded from the burden of deposition.  *See Reif*, 248 F.R.D. at 451, 454 (barring deposition of high-level executive where plaintiffs had deposed a number of managers with personal knowledge of the employment decision at issue and plaintiffs failed to demonstrate that the proposed deponent possessed any unique information); *Piontek v. I.C. Sys.*, No. 08-1207, 2008 WL 7674787, at * 1 (M.D. Pa. Oct. 22, 2008) (prohibiting executive's deposition when two other employees with superior knowledge were available to be deposed); *see also Ford Motor Co. v. Edgewood Properties, Inc.*, No. 06-1278, 2011 WL 677331, at *4 (D.N.J. Feb. 15, 2011) (Salas, J.), *aff'd*, 2011 WL 2517133 (D.N.J. June 23, 2011) (Martini, J.) (granting Ford's motion for a protective order concerning two executives, in a case about the demolition of a Ford assembly plant and related environmental issues, despite that (1) executives' signatures appeared on a key internal memo and (2) lower-level executives needed to seek their approval to sell assets or to obtain funding for corporate projects; this did "not rise to the level of superior knowledge.").

In their position below, Plaintiffs' confirm that they seek Mr. McMahon for the exact topics about which they have already had many depositions.

- *Compensation Decisions*:  Plaintiffs assert that Mr. McMahon's deposition is needed to understand his role with respect to salary and sales incentive-related decisions.  Plaintiffs ignore that they have already taken a Rule 30(b)(6) deposition on compensation as well as a separate Rule 30(b)(6) deposition on Global Human Health sales incentive plans. Plaintiffs did not so much as mention Mr. McMahon during the compensation deposition and during the sales incentive deposition the testimony made clear that, after the sales incentive plans were designed, Mr. McMahon signed off on the plans (at one point in time). If Plaintiffs had additional questions regarding Mr. McMahon's role with respect to either compensation or sales incentive plans, the Rule 30(b)(6) depositions were the time to ask. Plaintiffs also could have explored Mr. McMahon's role in compensation decisions during any of the 14 other fact witness depositions that have occurred to date.

- *Promotion Decisions*:  Plaintiffs similarly contend that they need Mr. McMahon's deposition to understand the role he played in promotion decisions.  Again, Plaintiffs had a Rule 30(b)(6) deposition on this topic.  And, again, Plaintiffs did not so much as mention Mr. McMahon during that deposition, much less inquire about any alleged role he played in the process.

- *Career Pathways*:  Plaintiffs also want to ask Mr. McMahon about his role in the Career Pathways process, another topic about which Plaintiffs had a Rule 30(b)(6) deposition. Again, during that deposition, there was no mention of Mr. McMahon or his role in this process.  Notably, Plaintiffs also took the deposition of John Daly—the individual whom they contend was "hand-selected" to participate in the Career Pathways restructuring. Plaintiffs asked Mr. Daly about his role and the process generally.  This too was an opportunity for Plaintiffs to get the knowledge they now seek from an apex witness.

The very purpose of Rule 30(b)(6) depositions is to allow a party to set forth specific topics about which they seek information and to obligate the other party to identify a witness to address those topics.  Here, Plaintiffs served a Rule 30(b)(6) Notice of Deposition containing 90 topics and Defendants proffered eight witnesses to address these topics.  While these topics encompassed the

precise issues about which Plaintiffs seek to question Mr. McMahon, Plaintiffs did not explore these topics during the actual Rule 30(b)(6) depositions.  They should not be permitted to burden a high-level executive now to make up for this failing.

Furthermore, none of the documents Plaintiffs cite suggest that Mr. McMahon possesses any unique knowledge or information.  Nor do they support an assertion that he was making compensation, promotion or performance decisions relating to sales representatives.  Rather, they show that, at one point in time, for budgetary purposes, merit increase decisions rolled up to Mr. McMahon for sign off—the one day allotted for Mr. McMahon's review was certainly not intended to allow him to substantively examine the merit increases of thousands of employees.  (Ex. P-24, MRK0153462 and Ex. P-25, MRK0138405.)  And with respect to sales incentive plans, the fact that Mr. McMahon signed off on the ultimate plan design (at one point) is not disputed.  (Ex. P-26, MRK0145753, Ex. P-27, MRK0154934, and Ex. P-28, MRK0148203.)  Moreover, that Mr. McMahon was emailed regarding the need to change one employee's performance rating in the system of record because it was entered incorrectly due to human error is not evidence that he makes performance evaluation decisions for sales representatives.  (Ex. P-29, MRK0147126.)  Finally, Mr. McMahon's participation on the Career Pathways steering committee and "review [of] the approach to job structure" is also not evidence that he possesses some knowledge or information that could not have been obtained from the other witnesses whom Plaintiffs have already deposed.

Finally, Plaintiffs concern about the ability of witnesses to testify regarding reporting structure is also not grounds to justify the deposition of an apex witness.  If Plaintiffs want to know who reports to Mr. McMahon as President of Global Human Health for the U.S. Market, Defendants will answer an interrogatory providing this information.  There is no need to take the time of a high-level executive to ask him who reports to him.  Nor is this information even relevant—the record has been clear with respect to who makes the decisions at issue—i.e. the first-line managers—and the layers of management between those individuals and Mr. McMahon does not change that reality.

In short, there is not a shred of evidence in any deposition or document to suggest that Mr. McMahon made any substantive determination relating to a sales representative's compensation, promotion or performance evaluation.  Plaintiffs simply conflate the concepts of high-level oversight and budgetary review with actual decision-making (which is done by first-line managers) with the hope that they will secure an otherwise improper deposition.

2.    *Plaintiffs' Proposed Compromises*

Plaintiffs suggest they have offered meaningful compromises to resolve this dispute.  That is not true.  Plaintiffs' first proposed compromise was to reopen negotiations regarding electronically stored information and add Mr. McMahon as a custodian.  This "compromise" would have required Defendants to undertake the burden of collecting, reviewing and producing ESI in the very final days of discovery—more than 18 months after the parties negotiated the terms of ESI.  Second, Plaintiffs offered to compromise on their request to take Mr. McMahon's oral deposition by taking Mr. McMahon's oral deposition—the very thing Defendants maintain is improper.  Plaintiffs misrepresent below that they offered a written deposition.  This is untrue.  Plaintiffs' counsel proposed:  "Mr. McMahon . . . answer 35 questions orally before a court reporter on May

10, 11 or 12, 2017. Plaintiffs will provide the questions the morning of the deposition." While Defendants offered to discuss the option of an actual written deposition—as your Honor suggested—Plaintiffs never engaged.

For the foregoing reasons, Defendants respectfully request that the Court issue a protective order to bar Mr. McMahon's deposition.

### B.    *Plaintiffs' Position*

Robert McMahon possesses "nonprivileged matter that is relevant" to Plaintiffs' claims. *See* Fed. R. Civ. P. 26(b). Specifically, Plaintiffs seek to question Mr. McMahon regarding his involvement in pay and promotion decisions and policies relating to sales representatives, as well as his involvement in restructuring of Merck's sales force, including the 2011 Career Pathways restructuring. Defendants have (at least) twice rebuffed Plaintiffs' attempts to obtain information possessed by Mr. McMahon through alternative means. Now, Defendants rely on a line of inapposite case law, which they present without supporting references to evidence. Further, documents produced by Merck belie their assertions about Mr. McMahon's lack of knowledge or personal involvement in key decisions relating to compensation, placement and promotion of sales representatives. As set forth below, Defendants' own productions confirm Mr. McMahon's direct involvement in decisions which are central to Plaintiffs' class-wide discrimination claims.

### 1.    *Defendants' Own Conduct Undercuts Their Claims of Burden*

Plaintiffs noticed Mr. McMahon's deposition on March 30, 2017. On April 11, Defendants demanded that Plaintiffs withdraw the notice. Plaintiffs responded on April 19, and the parties brought the dispute to the Court's attention on April 24. Plaintiffs then made two attempts to obtain information from Mr. McMahon without subjecting him to an in-person deposition. First, Plaintiffs offered to forgo Mr. McMahon's deposition in return for Defendants' agreement to produce Electronically Stored Information ("ESI") in Mr. McMahon's possession. This proposal would have involved *no burden on Mr. McMahon whatsoever*. Defendants refused. Plaintiffs then took up the Court's suggestion that Mr. McMahon submit to a Rule 31 deposition by written questions, and proposed that he answer 35 written questions to determine whether a further examination is necessary.[22] Defendants again declined. These refusals undercut Defendants' arguments regarding the burden of this deposition. Rather, it appears that Defendants simply wish to shield information.

### 2.    *Documents and Testimony Indicate that Mr. McMahon Plays a Unique and Central Role in Decisions Concerning Merck's Sales Force*

Presaging exactly what Mr. McMahon's testimony will be puts the cart before the horse. But the approximately 500 documents produced by Defendants that reference Mr. McMahon indicate that he is the ultimate decision maker on all pay and promotion decisions for Sales Representatives.[23]

---

[22] With regard to Merck's claim that Plaintiffs proposed an "oral deposition," Plaintiffs refer Defendants to Federal Rule of Civil Procedure 31(b), which states: "The party who noticed the deposition must deliver to the officer a copy of all the questions served and of the notice. The officer must promptly proceed in the manner provided in Rule 30(c), (e), and (f) to: (1) take the deponent's testimony in response to the questions; (2) prepare and certify the deposition; and (3) send it to the party, attaching a copy of the questions and of the notice.

[23] Defendants' argument that Mr. McMahon should not be deposed *because* they have produced only 50 documents from Mr. McMahon's custody is circular and unconvincing. Plaintiffs initially proposed Mr. McMahon as a custodian of Electronically Stored Information ("ESI") whose ESI *should* be searched. Defendants, however, refused. At that

For example, documents specifically indicate that Merck reserves time for Mr. McMahon (identified by name) to review key compensation decisions and decisions on compensation planning for the Global Human Health sales force, including base salary, merit increases (Ex. P-24, MRK0153462, and Ex. P-25, MRK0138405), and incentive payments (Ex. P-26, MRK0145753, Ex. P-27, MRK0154934, and Ex. P-28, MRK0148203). In addition, Mr. McMahon personally approves changes in performance categories for certain individual employees. (Ex. P-29, MRK0147126.)

Documents further indicate that Mr. McMahon was deeply involved in Merck's 2011 "Career Pathways" restructuring, which resulted in a discriminatory outcome for female sales representatives. Mr. McMahon both served on the Steering Committee for this project (Ex. P-30, MRK0163108) and hand-selected Director of Commercial Operations John Daly to participate in it. (Ex. P-31, MRK0082320.) (Mr. Daly is identified in the operative Complaint as having discriminated against lead Plaintiff Kelli Smith.) Subsequently, Mr. McMahon was personally involved in concomitant changes to performance management policies. He stated that he was "in the process of evaluating several options for differentiation [(Merck's performance evaluation process)] as well as the criteria for VP and Master's Awards," (Ex. P-32, MRK0068198), and later stated that he had "reviewed the approach to job structure . . . [and] support[ed] adjusting upward the number of 03 [Sales Representative]s." (Ex. P-33, MRK0221789.) This latter decision is crucial, because the exclusion of women from the S3 position significantly influenced disparities in pay.

Defendants' argument that Plaintiffs could obtain information regarding Mr. McMahon's involvement in these processes from other witnesses is belied by testimony from Defendants' witnesses. For example, as Plaintiffs explained to Defendants in letters dated April 19, 2017, April 3, 2017, and September 20, 2016 (Ex. P-11; Exs. P-34-P-35), no Merck witness to date has been able to testify adequately regarding Merck's executive reporting structure. Plaintiffs' September 20, 2016 letter specifically noted that that Merck's Rule 30(b)(6) deponent on the structure of its sales force "was unable to speak about Merck's corporate structure as it pertains to executive-level decision-making at Merck. [The deponent,] could not identify the members of the Executive Committee or the Oversight Committee at Merck (Nissen Tr. 94)."[24] To now say that Plaintiffs have not shown that the information sought "could not be obtained from lower level employees or through less burdensome means" fails to account for *Defendants' own failure to identify such lower level employees*. *See supra* (quoting *United States ex rel. Galmines v. Novartis Pharma. Corp.*, No. 06-3213, 2015 WL 4973626 (E.D. Pa. Aug. 20, 2015)). Plaintiffs are entitled to a fact witness who can testify to exactly the process of deliberations, how they were conducted in the relevant years, who participated, what was said, the considerations taken into account and those overlooked.

---

time, Defendants had produced only roughly 78 documents mentioning Mr. McMahon. For this and other reasons, Plaintiffs agreed to move forward with ESI searches of other custodians. Since that time, however, Defendants have produced roughly 400 documents mentioning Mr. McMahon. Defendants have also, to date, produced approximately 50 documents from Mr. McMahon's custody—somewhat mysteriously, given Defendants' earlier refusal. To now claim that Plaintiffs' agreement not to search Mr. McMahon's ESI approximately one year ago renders him off-limits for a deposition is tautological at best, disingenuous at worst, and, in either event, contradicted by Rule 26(b)(1).

[24] To exacerbate these failings, Blair Robinson, Counsel for Defendants, at times expressly instructed the deponent, Janice Nissen, not to answer questions on these topics. (Ex. P-36, Nissen Tr. 109:16 – 110:13.)

Testimony to date is inconsistent on the role of "sales leadership" in the pay and promotion decisions at issue. In arguing that Mr. McMahon plays no role in the decisions that Plaintiffs challenge, Defendants assume the outcome of the inquiry and create ambiguities that require resolution. If the express carve out for Mr. McMahon's review and approval of these decisions is truly insubstantial, he can so testify under oath, and he may further address follow up questions, such as why a meaningless review is deliberately built into the annual schedule. Mr. McMahon's deposition is therefore warranted, at the very least, to permit him to testify why documents reflecting his review and approval of pay and promotion decisions are inaccurate.

### 3. *Case Law Supports Plaintiffs' Position*

The Defendants invoke the apex doctrine and seek to cast a burden of proof onto Plaintiffs. This misinterprets the law: "The apex doctrine does not represent an exception to the rule that a party seeking to quash a subpoena bears the 'heavy burden' of demonstrating that the subpoena represents an undue burden." *Galmines*, 2015 WL 4973626 at *2. To avoid a deposition, Defendant must demonstrate that "the discovery can be obtained from some other source that is more convenient, less burdensome, or less expensive." *Id.*

Defendants fail to meet this burden: They suggest no other potential deponents to fill the void—despite the Court's suggestion that they do so—and have rebuffed Plaintiffs' attempts at compromise. Moreover, Defendants cite no facts beyond Mr. McMahon's job title that should render him immune to discovery. And, unlike some of the cases on which they rely, Defendants have submitted no affidavits supporting their position.[25] *See Reif, et al. v. CNA, et al.*, 248 F.R.D. 448 (E.D. Pa. 2008) (considering a motion to quash supported by affidavits from defense counsel and another corporate executive, articulating the corporate chain of command and identifying other potential deponents); *Roman v. Cumberland Ins. Grp.*, No. 07-1201, 2007 WL 4893479, at * 1 (E.D. Pa. Oct. 26, 2007) (citing affidavits from other more knowledgeable employees offering to make themselves available for deposition). Courts have rejected motions to quash for precisely such failings. *See Naftchi v. N.Y. Univ. Med. Ctr.*, 172 F.R.D. 130, 133 (S.D.N.Y. 1997) (denying a motion to bar a deposition where the potential deponent's affidavit did not state he lacked "information pertinent to the lawsuit or that could lead to relevant evidence.").

Defendants' distortions of the case law do not stop there. Defendants cite *Reif*, 248 F.R.D. 448, as a decision "denying deposition of high-level executive where plaintiffs had deposed a number of managers with personal knowledge of the employment decision at issue and plaintiffs failed to demonstrate that the proposed deponent possessed any unique information." But *Reif* was not a class case, where centralized decision-making on pay and promotions is, by definition, at issue. Moreover, the request to depose the "high-level executive" in that case preceded the deposition of the defendant's corporate representative, who should have had the knowledge sought. In class cases, where centralization of decision-making is an issue, more senior personnel often have unique knowledge and courts permit such depositions. *See, e.g., Moore v. Angie's List, Inc.*, No. CV 15-1243, 2015 WL 12835674, at *2 (E.D. Pa. Dec. 21, 2015) (denying a motion to quash the deposition of "the co-founder, namesake, board member, and current Chief Marketing Officer" in class case because "[i]f anyone in the world would have 'personal, superior, or unique knowledge,'

---

[25] Defendants offer an untimely declaration from Mr. McMahon "confirming the facts set forth" in their position statement. The time required for Mr. McMahon to review testimony and confirm that he has no unique knowledge would be better spent testifying in the Rule 31 deposition proposed by Plaintiffs and the Court.

of [the] practices which are at the center of this dispute, it would be [the deponent]," and because no lower level employees "can be assumed to have the same in-depth knowledge about the company's origins and history, nor the evolution of its marketing practices over the past two decades"). Moreover, *Reif* cited case law on *CEOs*, which Mr. McMahon is not.[26]

"Simply stated, the apex doctrine applies when those at the top of the company, i.e. men and women at the 'apex,' really don't have personal knowledge about . . . anything else that might be of interest to the plaintiffs, or the attorneys, or the jury, or the court." *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 2:13-MD-02436, 2014 WL 3035791, at *2 (E.D. Pa. July 1, 2014). Here, by contrast, "documents, which have been produced by the defendants during discovery, show very clearly that [the high-ranking executive] was actively involved in decision making regarding [material issues]. . . . They also indicate that [he] has knowledge that is unique to him and which could not be obtained through the depositions of those other . . . employees not quite at the 'apex.'" *Galmines*, 2015 WL 4973626, at *2 (quoting *In re Tylenol*, 2014 WL 3035791, at *3). Plaintiffs are entitled to inquire into these decisions.

In sum, Plaintiffs have attempted to obtain information from Mr. McMahon by other means, but Defendants have rejected each attempt at compromise. Defendants' other deponents have provided inconsistent testimony, and Defendants' assertions that their own documents do not accurately reflect the decision-making and approval process underscore the need for this deposition.

---

[26] *Reif* also noted that the Third Circuit had yet to weigh in on the apex doctrine, and that remains the case today.

Respectfully Submitted,

s/ David Tracey
_____
David Tracey (NJ ID# 081062013)
Russell Kornblith (*pro hac vice*)
Andrew Melzer (*pro hac vice*)
**SANFORD HEISLER LLP**
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402.5658
Facsimile:  (646) 402.5651


Deborah K. Marcuse (*pro hac vice*)
Lila Miller (*pro hac vice*)
**FEINSTEIN DOYLE PAYNE & KRAVEC, LLC**
429 Fourth Avenue, Ste. 1300
Pittsburgh, PA 15219
Telephone:  (412) 281-8400, ext. 121


*Attorneys for Plaintiffs and the Class*

s/ Michael S. Burkhardt
_____
Michael S. Burkhardt (NJ ID#008541993)
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: (215) 963-5000
Facsimile: (215) 963-5001


Blair Robinson (NJ ID# 040712004)
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York  10178
Telephone:  (212) 309-6000


Krissy Katzenstein (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave NW
Washington, DC  20004
Telephone:  (202) 739-3000


*Attorneys for Defendants*